Michael D. Pinsky, P.C.
Attorney for Debtors
211 Main Street, Box 148
Goshen, New York 10924-0148
Tel. (845) 294-5123
Mike Pinsky, Esq.

UNITED STATES ~~BANKRUPTCY~~ COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x

In re: WILLIAM J. LEROY and,                    Chapter 13
      CHARLENE LEROY,                    Case No. 08-35516 (cgm)

              Debtors.
-------------------------------------------------------x

**BRIEANT**

**08 CIV. 3851**

## NOTICE OF REMOVAL OF
## STATE COURT CIVIL ACTION TO BANKRUPTCY COURT

TO:    THE HONORABLE CECELIA G. MORRIS, UNITED STATES BANKRUPTCY
        JUDGE, EQUIFIRST CORPORATION, THE CLERK OF THE SUPREME COURT OF
        THE STATE OF NEW YORK, COUNTY OF SULLIVAN, AND THE CLERK OF THE
        UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW
        YORK, WHITE PLAINS DIVISION:

        PLEASE TAKE NOTICE that William J. LeRoy and Charlene LeRoy (the "Debtors")

submit this Notice of Removal pursuant to Rule 9027 of the Federal Rules of Bankruptcy

Procedure (the "Bankruptcy Rules"), 11 U.S.C. § 1452(a), and 28 U.S.C. § 157, and respectfully

represent as follows:

        1.      The Debtors filed a voluntary bankruptcy petition on 3/20/2008, commencing the

above-captioned Chapter 13 case which is pending before the United States Bankruptcy Court

for the Southern District of New York, Poughkeepsie Division.

2.      At the time of the commencement of the Chapter 13 case, a state court civil action

for the foreclosure of a mortgage (the "Civil Action") entitled *"Equifirst Corporation vs. William*

*J. LeRoy a/k/a William Leroy; Charlene LeRoy a/k/a Charlene Leroy, and "JOHN DOE #1"*

*through "JOHN DOE #10", the last ten names being fictitious and unknown to the Plaintiff, the*

*person or parties intended being the persons or parties, if any, having or claiming an interest in*

*or lien upon the mortgaged premises described in the complaint, Defendants"* was pending

before the Supreme Court of the State of New York, County of Sullivan, (the "State Court"). The

Civil Action is assigned Index No. 08-492. The Civil Action, until the filing of this Notice of

Removal and the filing of a copy of this Notice of Removal with the State Court, was still

pending before the State Court.

3.      This Notice of Removal is timely, as the stay remains in effect and this Notice has

been filed less than ninety (90) days after the order for relief in the above-captioned Chapter 13

case. This case has not been converted from a Chapter 11 case, and no Chapter 11 trustee has

qualified. Bankruptcy Rule 9027(a)(3).

4.      The Debtors are entitled to remove the Civil Action to the District Court for

referral to the Bankruptcy Court because (i)The Plaintiff's claims and causes of action in the

Civil Action are related to the Chapter 13 case, and (ii) the Debtors' defenses and counterclaims

(for mortgage origination fraud and for the rescission of EquiFirst's lien under The Truth in

Lending Act, 15 U.S.C. § 1601, et seq., and Regulation Z, 12 C.F.R. § 226) in the Civil Action

have a clear and direct impact on property of the bankruptcy estate under 11 U.S.C. § 541(a).

Resolution of the Debtors' defenses and counterclaims asserted in the Civil Action will

significantly effect the administration of this bankruptcy estate and would involve the allowance

or disallowance of the largest claims against the estate, counterclaims by the estate to determine

the validity of liens, attempts to obtain the property of the estate, and proceedings affecting the liquidation of assets of the estate and the adjustment of the debtor/creditor relationship and the equity security holder relationship.

5.      The Debtors' defenses and counterclaims in the Civil Action constitute core proceedings under 28 U.S.C. § 157(A), (B), (C), (K), (L) and (O). In the event that any claim or cause of action, defense or counterclaim asserted in the Civil Action is determined to be non-core, the Debtors consent to the entry of final orders or judgments by the Bankruptcy Judge.

6.      The Bankruptcy Court presiding over the Chapter 13 case, pursuant to 28 U.S.C. §§ 1334(b), 157(a) and the Standing Order of Referral of Cases to Bankruptcy Judges for the Southern District of New York, dated July 10, 1984 (Ward, Acting C.J.), has jurisdiction of each and every claim, cause of action, defense and counterclaim asserted in the Civil Action.

7.      This Notice of Removal is accompanied by a copy of process and pleadings (as defined by Rule 7 of the Federal Rules of Civil Procedure) in the Civil Action, in accordance with Bankruptcy Rule 9027(a)(1). If additional documents relating to the Civil Action are required, the Debtors will submit such documents.

NOW THEREFORE, all parties to the Civil Action pending in the State Court bearing Index No. 08-492 are HEREBY NOTIFIED pursuant to Bankruptcy Rule 9027 as follows:

Removal of the Civil Action and all claims, causes of action, defenses and counterclaims therein was effected upon the filing of a copy of this Notice of Removal with the Clerk of the State Court. The Civil Action is removed from the State Court to the Bankruptcy Court presiding over the Chapter 13 case. The parties to the Civil Action shall proceed no further in the State Court unless and until the action is remanded by the Bankruptcy Court.

3

Dated: Goshen, New York
April 17, 2008

/s/ Mike Pinsky
Michael D. Pinsky, P.C.
Attorney for Debtors
211 Main Street, Box 148
Goshen, New York 10924-0148
Tel. (845) 294-5123
Fax. (845) 294-9384
Email mpinsky@frontiernet.net

LeRoy Notice of Removal 4-17-08
C:/My Documents/Chapter 13/LeRoy/Leroy adv EquiFirst

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF SULLIVAN

Equifirst Corporation,

        Plaintiff,

   -against-

William J. LeRoy a/k/a William Leroy; Charlene LeRoy
a/k/a Charlene Leroy, and "JOHN DOE #1" through "JOHN
DOE #10", the last ten names being fictitious and unknown
to the Plaintiff, the person or parties intended being the
person or parties, if any, having or claiming an interest in or
lien upon the mortgaged premises described in the complaint,

        Defendants.

**MORTGAGE FORECLOSURE
COMPLAINT**

Index No. _08-492_

Date Filed: _2/14/08_

   The Plaintiff herein, by its Attorneys, Shapiro & DiCaro, LLP, complains of the

defendants above named, and for its cause of action, alleges:

   <u>First:</u>   That the Plaintiff herein, at all times hereinafter mentioned was and still is

a duly authorized Corporation or Association and having an office at Special Assets - NC 4742,

701 Corporate Center Drive, Raleigh, North Carolina 27607.

**PLAINTIFF FURTHER ALLEGES
UPON INFORMATION AND BELIEF**

   <u>Second:</u>   The defendants set forth in Schedule "A" reside or have a place of

business at the address set forth therein (any that are corporations being organized and existing

under the laws of the State set forth therein) and are made defendants in this action in the

capacities therein alleged and for the purpose of foreclosing and extinguishing any other right,

title or interest said defendants may have in the subject premises.

Third:        That the United States of America, The People of the State of New York,

The State Tax Commission of the State of New York, the Industrial Commissioner of the State

of New York and all other agencies or instrumentalities of the Federal, State or local government

(by whatever name designated) if made parties to this action and if appearing in Schedule "B",

are made parties solely by reason of the material set forth in Schedule "B" and for no other

reason.

Fourth:        That heretofore, the defendant(s), William J. LeRoy and Charlene LeRoy,

for the purpose of securing to Mortgage Electronic Registration Systems, Inc., as nominee for

Equifirst Corporation, its successors and assigns, the sum of $213,300.00, duly made a certain

bond, note, consolidation, extension, modification, recasting, or assumption agreement, as the

case may be, wherein and whereby they bound themselves, their heirs, executors, administrators

and assigns, and each and every one of them, jointly and severally, in the amount of said sum of

money, all as more fully appears together with the terms of repayment of said sum or rights of

the plaintiff in said bond, note or other instrument, a copy of which is attached hereto and made a

part hereof.

Fifth:        That as security for the payment of said indebtedness, a mortgage was

executed, acknowledged and delivered to Mortgage Electronic Registration Systems, Inc., as

nominee for Equifirst Corporation, wherein and whereby the mortgagor(s) named therein

mortgaged, bargained, granted an interest in and/or sold to the mortgagee, its successors and

assigns, the premises more particularly described therein, hereinafter called "mortgaged

premises", under certain conditions with rights, duties and privileges between or among them as

more fully appears in said mortgage, a copy of which is attached hereto and made a part hereof.

Sixth:        That the said mortgage was duly recorded and the mortgage tax due

thereon was duly paid on the recorded instrument in the proper County Clerk's Office at the

place and time which appears thereon. If Plaintiff is not the original mortgagee then information

regarding the chain of title will be contained in Schedule D.

Seventh:        That the defendants, William J. LeRoy and Charlene LeRoy, so named,

have failed and neglected to comply with the conditions of said mortgage, bond or note by

omitting and failing to pay the monthly payments of principal, interest, taxes, assessments, water

rates, insurance premiums, escrow and/or other charges, all as more fully appear in Schedule C,

and accordingly, the plaintiff has duly elected and does hereby elect to call due the entire amount

presently secured by the mortgage described in paragraph "FIFTH" hereof.

Eighth:        That heretofore and prior to the commencement of this action, part of the

original principal sum was paid to apply on said indebtedness and there remains due the amount

set forth in said Schedule C.

Ninth:        That in order to protect its security, the plaintiff has paid, as set forth in

Schedule C, and/or may be compelled during the pendency of this action to pay local taxes,

assessments, water rates, insurance premiums, inspections and other charges affecting the

mortgaged premises, and the plaintiff requests that any sums thus paid by it for said purposes

(together with interests thereon) should be added to the sum otherwise due and be deemed

secured by the said mortgage and be adjudged a valid lien on the mortgage premises.

Tenth:        That the defendants herein have, or claim to have, some interest in or lien

upon, said mortgaged premises or some part thereof, which interest or lien, if any, has accrued

subsequent to the lien of plaintiff's mortgage.

**Eleventh:**          That the plaintiff is the true and lawful owner of the said bond/note and mortgage securing the same and all sums presently due thereunder.  That there are no pending proceedings at law or otherwise to collect or enforce said bond/note and mortgage and that there is no other action pending which has been brought to recover said mortgage debt or any part thereof.

**Twelfth:**          That the Schedules, Exhibits and other items attached to this complaint are expressly incorporated and made a part of this Complaint for all purposes with the same force and effect as if they were completely and fully set forth herein wherever reference has been made to each of any of them.

**Thirteenth:**          That by reason of the foregoing, there is now due and owing to the plaintiff upon said bond, note, assumption agreement, consolidation agreement, or recasting agreement, the amount set forth in Schedule C.

**Fourteenth:**          The mortgage provides that, in the case of foreclosure, the mortgaged premises may be sold in one parcel.

**Fifteenth:**          The Plaintiff shall not be deemed to have waived, altered, released or changed the election hereinbefore made by reason of the payment or performance, after the date of the commencement of this action, of any or all of the defaults mentioned herein; and such election shall continue and remain effective until the costs and disbursements of this action, and all present and future defaults under the Note and Mortgage and occurring prior to the discontinuance of this action are fully paid and cured.

**Sixteenth:**          Pursuant to the Fair Debt Collection Practices Act, this action may be deemed to be an attempt to collect a debt, on behalf of Plaintiff.  Any information obtained as a result of this action will be used for that purpose.

**WHEREFORE**, plaintiff demands judgment:

(a)    Adjudging and decreeing the amounts due the plaintiff for principal, interest, costs, and reasonable attorney's fees, if and as provided for in the said mortgage;

(b)    That the defendants and all persons claiming by, through or under them, or either or any of them, subsequent to the commencement of this action and every other person or corporation whose right, title conveyance or encumbrance is subsequent to or subsequently recorded, may be barred and forever foreclosed of all right, claim, lien, or interest, or equity of redemption in and to said mortgaged premises;

(c)    That the said mortgaged premises, or such part thereof as may be necessary to amounts then due for principal, interest, costs, reasonable attorney's fees, allowances and disbursements, together with any monies advanced and paid, may be decreed to be sold according to law;

(d)    That out of the monies arising from the sale thereof, the plaintiff may be paid the amounts then due on said bond/note and mortgage and any sum which may have been paid by the plaintiff to protect the lien of plaintiff's mortgage as herein set forth, with interest upon said amounts from the dates of the respective payments and advances thereof, the costs and expenses of this action, additional allowance, if any, and reasonable attorney's fees, if and as provided for in the mortgage, rider or other agreement, so far as the amount of such money properly applicable thereto will pay the same;

(e)    That either or any of the parties to this action may become a purchaser upon such sale;

(f)    That this Court forthwith appoint a Receiver of the rents and profits of said premises with the usual powers and duties;

(g)     That the defendant, William J. Leroy a/k/a William J. LeRoy and Charlene Leroy a/k/a Charlene LeRoy, <u>unless discharged in bankruptcy</u> may be adjudged to pay any deficiency that may remain after applying all of said monies so applicable thereto;

(h)     That the United States of America shall have the right of redemption, if applicable;

(i)     That the plaintiff may have such other or further relief, or both, in the premises as may be just and equitable.

Plaintiff specifically reserves its right to share in any surplus monies arising from the sale of subject premises by virtue of its position as a judgment or other lien creditor excluding the mortgage being foreclosed herein.

Dated: February 13, 2008

Frank M. Cassara, Esq.
SHAPIRO & DICARO, LLP
Attorneys for Plaintiff
250 Mile Crossing Boulevard
Suite One
Rochester, NY 14624
(585) 247-9000
Our File No. 08-070861

## SCHEDULE A – DEFENDANTS

<table>
<tr><td align="center"><u>DEFENDANTS</u></td><td align="center"><u>CAPACITY</u></td></tr>
<tr>
<td>William J. LeRoy a/k/a William Leroy<br>43 Aldow Street<br>Wurtsboro, NY 12790</td>
<td>Owner of record and original obligor under the Note secured by the Mortgage recorded in Vol. 3242 of Mortgages, page 385, being foreclosed herein.</td>
</tr>
<tr>
<td>Charlene LeRoy a/k/a  Charlene Leroy<br>4?   ow Street<br>      ro, NY 12790</td>
<td>Owner of record and original obligor under the Note secured by the Mortgage recorded in Vol. 3242 of Mortgages, page 385, being foreclosed herein.</td>
</tr>
<tr>
<td>DOE #1 through "JOHN DOE #10"</td>
<td>Said names being fictitious, it being the intention of Plaintiff to designate any and all occupants, tenants, persons or corporations, if any, having or claiming an interest in or lien upon the premises being foreclosed herein.</td>
</tr>
</table>

## SCHEDULE B -- DEFENDANTS

NONE

## SCHEDULE C

## MORTGAGE INFORMATION

| | | |
|---|---|---|
| 1. | Original Amount of Bond/Note/ Consolidation or Modification Agreement | $213,300.00 |
| 2. | Last installment due and paid | October 1, 2007 |
| 3. | Date of first unpaid installment/ default date | November 1, 2007 |

## AMOUNT DUE

| | | |
|---|---|---|
| | Principal balance | $212,043.74 |
| 5. | *Interest @ 9.3% from October 1, 2007 | |
| 6. | Late charges commencing November 16, 2007 @ 2% of Principal and Interest (to be determined) | |
| 7. | Accrued late charges prior to default | $0.00 |
| 8. | Escrow balance | $0.00 |

*To be computed to the date of judgment.*

(08-070861)

## **SCHEDULE D**

   The Plaintiff became the owner of the note and mortgage as a result of a purchase thereof for valuable consideration prior to the commencement of this action. The Assignment of Mortgage memorializing Plaintiff's interest has not yet been recorded; however, Plaintiff has standing to prosecute the foreclosure action in its capacity as beneficial owner and holder of the note and mortgage.

(08-070861)

# ADJUSTABLE RATE NOTE
### (LIBOR Index – Rate Caps)

MIN 100200100107287710

**THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT MY INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM AND MINIMUM RATE I MUST PAY.**

October 20, 2006                       Wurtsboro                       NY
(Date)                                 (City)                          (State)

43 Aldaw Street, Wurtsboro, NY 12790
(Property Address)

## 1. BORROWER'S PROMISE TO PAY
In return for a loan that I have received, I promise to pay U.S. $ 213,300.00 (this amount is called "principal"), plus interest, to the order of the Lender. The Lender is EquiFirst Corporation . I will make all payments under this Note in the form of cash, check or money order. I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST
Interest will be charged on unpaid principal until the full amount of principal has been paid. I will pay interest at a yearly rate of 9.300 %. The interest rate I will pay may change in accordance with Section 4 of the Note. The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

## 3. PAYMENTS
(A) Time and Place of Payments
I will pay principal and interest by making a payment every month.
I will make my monthly payments on the 1st day of each month beginning on  December 1, 2006 . I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before principal. If on  November 1, 2036 , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."
I will make my monthly payments at
EquiFirst Corporation , 500 Forest Point Circle , Charlotte, NC 28273
or at a different place if required by the Note Holder.

(B) Amount of My Initial Monthly Payments
Each of my initial monthly payments will be in the amount of U.S. $ 1,762.51 .
This amount may change.

(C) Monthly Payment Changes
Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

## 4. INTEREST RATE AND MONTHLY PAYMENT CHANGES

**(A) Change Dates**

The interest rate I will pay may change on November 1, 2008, and on that day every sixth month thereafter. Each date on which my interest rate could change is called a "Change Date."

**(B) The Index**

Beginning with the first Change Date, my interest rate will be based on an index. The "Index" is the average of interbank offered rates for six-month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in *The Wall Street Journal*. The most recent Index figure available as of the first business day of the month immediately preceding the month in which the Change Date occurs is called the "Current Index".

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding 6.930 percentage points ( 6.930 %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than 12.300% or less than 9.300 % . Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than one percentage point (1.000%) from the rate of interest I have been paying for the preceding six months. My interest rate will never be greater than 15.300% or less than the initial interest rate provided for in Section 2 of this Note.

**(E) Effective Date of Change**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

## 5. BORROWER RIGHT TO PREPAY

I have the right to make payments of principal at any time before they are due. A payment of principal only is known as a "prepayment". When I make a prepayment, I will tell the Note Holder in writing that I am doing so. I may make a full prepayment or partial prepayments without paying any prepayment charge. The Note Holder will use all of my prepayments to reduce the amount of principal that I owe under this Note. If I make a partial prepayment, there will be no changes in the due dates of my monthly payment unless the Note Holder agrees in writing to those changes. My partial payment may reduce the amount of my monthly payments after the first Change Date following my partial prepayment. However, any reduction due to my partial prepayment may be offset by an interest rate increase.



**6. LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (i) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (ii) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the principal I owe under this Note or by making a direct payment to me. If a refund reduces principal, the reduction will be treated as a partial prepayment.

**7. BORROWER'S FAILURE TO PAY AS REQUIRED**

**(A) Late Charge for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of 15 calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be 2.00 % of my overdue payment of principal and interest. I will pay this late charge but only once on each late payment.

**(B) Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C) Notice of Default**

If I am in default, the Note holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**(D) No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note, whether or not a lawsuit is brought, to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

**8. GIVING OF NOTICES**

... applicable law requires a different method, any notice that must be given to me under this Note will ... delivering it or by mailing it by first class mail to me at the Property Address above or at a different ... give the Note Holder a notice of my different address.

... tice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**9. OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

**10. WAIVERS**

I and any other person who has obligations under this Note waive the rights of presentment and notice of dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**11. UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

Transfer of the Property or a Beneficial Interest in Borrower. If all or any part of the Property or any interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred), without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**"WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED"**

_____ (Seal)          _____ (Seal)
William J Leroy                    -Borrower        Charlene Leroy                    -Borrower

_____ (Seal)          _____ (Seal)
                                   -Borrower                                          -Borrower

_____ (Seal)          _____ (Seal)
                                   -Borrower                                          -Borrower

EF815N
Loan Number 1072877                Page 4 of 4                    Initials _____

## ADJUSTABLE INTEREST RATE FLOOR Addendum to Note

This ADJUSTABLE INTEREST RATE FLOOR ADDENDUM is made this 20th day of October, 2006, and amends the Note in the amount of U.S. $ 213,300.00 dated the same date and given by the person(s) who sign below (the "Borrower(s)") to EquiFirst Corporation (the "Lender").

In addition to the agreements and provisions made in the Note and the Security Instrument, and not withstanding any provisions to the contrary contained in said Note or the Security Instrument, both the Borrower(s) and the Lender further agree as follows:

### ADJUSTABLE INTEREST RATE FLOOR

THIS LOAN HAS AN INTEREST RATE "FLOOR" WHICH WILL LIMIT THE AMOUNT THE

RATE CAN DECREASE. REGARDLESS OF ANY CHANGES IN THE INDEX, THE

RATE DURING THE TERM OF THIS LOAN WILL NEVER BE LESS THAN THE INITIAL

RATE PROVIDED FOR IN SECTION 2 OF THE NOTE.

X _____          X _____
William J Leroy                            Charlene Leroy

_____          _____


_____          _____


_____          _____

1072877
EF060 (12/99)

Clerks Office
100 NORTH ST.
Monticello, NY 12701

INSTRUMENT ID: 2003-00040430

Type of Instrument: DEEDS, ETC.

Remarks: CK545,3759BG

TARANTO/GEORGE C
     TO
LEROY/WILLIAM

Received From: TRANSACTION TITLE AGENCY INC
               TARANTO/LEROY

Recording Charge:        92.00    Recording Pages:    5

** EXAMINED AND CHARGED AS FOLLOWS : **
** TRANSFER TAX **                 ** MTG/DEED AMOUNT **
        482.00                          120,500.00

RS#:   1135

                              Mortgage#:

                       Received Tax on Above Mortgage
                              Basic:           .00
                       Special Add'l:          .00
Town:                       Additional:        .00
                       Mortgage Tax Total:     .00

Total Recording Fees:      574.00

** THIS PAGE IS PART OF THE INSTRUMENT **

I HEREBY CERTIFY THAT THE WITHIN AND FOREGOING WAS RECORDED IN THE
CLERK'S OFFICE FOR SULLIVAN COUNTY CLERK

   INSTRUMENT ID#: 2003-00040430
ON (Recorded Date): 10/17/03
      AT (Time): 11:30
    Terminal ID:  114

                              Record and Return

                         TRANSACTION TITLE

                    GEORGE L. COOKE
                    SULLIVAN COUNTY CLERK

**THIS INDENTURE,** made the 30th day of September Two Thousand Three (2003)

BETWEEN     George C. Taranto and Karen A. Taranto, his wife
residing at 202 Appletree Lane Brewster, NY 10509

**GRANTORS,** and

party of the first part, and

William J. LeRoy and Charlene J. LeRoy, his wife, as tenants by the entirety,
residing at 22 Drew Avenue Highland Falls, NY 10928

**GRANTEES,** and

party of the second part,

WITNESSETH, that the party of the first part, in consideration of Ten Dollars, and other valuable
consideration, paid by the party of the second part, does hereby grant and release unto the party of the
second part, the heirs or successors and assigns of the party of the second part forever,

ALL that certain plot, piece or parcel of land, with the buildings and improvements thereon erected,
situate, lying and being in the

Town of Mamakating, County of Sullivan, and State of New York as more particularly described on
Schedule A attached hereto and made a part hereof,

This conveyance is made under and subject to covenants, conditions, restrictions and easements of record.

Being the same premises conveyed in a certain deed dated  August 5, 1983 from Mary Jane Ryan to
George C. Taranto and Karen A. Taranto , his wife, Grantors herein and recorded in the Sullivan County
Clerk's Office on August 15, 1983 in Liber 1090 of Land Records at page 182.

TOGETHER with all right, title and interest, if any, of the party of the first part in and to any streets and
roads abutting the above described premises to the center lines thereof; TOGETHER with the
appurtenances and all the estate and rights of the party of the first part in and to said premises;  TO HAVE
AND TO HOLD the premises herein granted unto the party of the second part, the heirs or successors and
assigns of the party of the second part forever.

AND the party of the first part covenants that the party of the first part has not done or suffered anything
whereby the said premises have been encumbered in any way whatever, except as aforesaid.

AND the party of the first part, in compliance with Section 13 of the Lien Law, covenants that the party of
the first part will receive the consideration for this conveyance and will hold the right to receive such
consideration as a trust fund to be applied first for the purpose of paying the cost of the improvement and
will apply the same first to the payment of the cost of the improvement before using any part of the total
of the same for any other purpose.

Title Number TT-1537-S

Revised: 03/12/2003
Page   1

All that certain plot, piece or parcel of land situate, lying and being in the Town of Mamakating, County of Sullivan and State of New York, known and designated as follows:

Tax Lot 34-7-2

Being Lots numbers 29, 30 and 31 inclusive in Block number 25 on a certain map entitled "Revised Map of Lands in the Town of Mamakating Owned by the Mountain Lake Campsite, Co." and filed in the Sullivan County Clerk's Office on June 21, 1926.

Beginning at a point in the southerly line of Aldow Street, said point being distant on a course of North 72 degrees 00' 00" West a distance of 300.00 feet from its intersection with the westerly line of Wilson Avenue and from said point running thence:

1) South 18 degrees 00' 00" West, a distance of 100.00 feet to a point; thence,
2) Along the lands now or formerly of Parisi North 72 degrees 00' 00" West, a distance of 60.00 feet to a point; thence,
3) Along the lands now or formerly of Schreier North 18 degrees 00' 00" East, a distance of 100.00 feet to a point in the southerly line of Aldow Street; thence,
4) Along the southerly line of Aldow Street, South 72 degrees 00' 00" East, a distance of 60.00 feet to the point of place of beginning.

Tax Lot 34-7-3

All that certain plot, piece or parcel of land situate, lying and being in the Town of Mamakating, County of Sullivan and State of New York, known and designated as Lots 32 to 41 in Block 25 on a certain map entitled "Revised Map of Lands Owned by Mountain Lake Campsite, Co." and filed in the Office of the Clerk of Sullivan on June 24, 1926.

Beginning at a point in the southerly line of Aldow Street, said point being distant on a course of North 72 degrees 00' 00" West a distance of 100.00 feet from its intersection with the westerly line of Wilson Avenue and from said point running thence:

1) Along the lands now or formerly of Sgueglia South 18 degrees 00' 00" West, a distance of 100.00 feet to a point; thence,
2) Along the lands now or formerly of DiSalvo and Parisi North 72 degrees 00' 00" West, a distance of 200.00 feet to a point; thence,

George C. Taranto

Karen A. Taranto

STATE OF NEW YORK     )
                      )
COUNTY OF ORANGE      )

On the 3rd day of Sept        2003 before me, the undersigned, personally appeared
George C. Taranto and Karen A. Taranto, his wife,     personally known to me or proved to me on the basis of
satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and
acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their
signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted,
executed the instrument.

Town of Mamakating
SBL: 34-7-2 and 34-7-3

notary public

DAWN M. CONKLIN
Notary Public, State of New York
Ulster County - NYS Reg. #4897670
Commission Expires June 15, 20__

RETURN BY MAIL TO:
Mark Specthrie
Attorney at Law
19-21 Dewitt Street
Middletown, New York 10940

Mortgage with Cover Sheet

P_ _ : **LEROY WILLIAM J**
          To
          **EQUIFIRST CORPORATION**

Recorded By: **LUBERTY TITLE AGENCY NY**
   Document:

Billable Pages:     21
Num Of Pages:     22

---

## ** Examined and Charged as Follows: **

| | Amount | Consideration Amount | RS#/CS# | | | | |
|---|---|---|---|---|---|---|---|
| Mortgage with Cover Sheet | 91.00 | | | | | | |
| Recording Charge: | 91.00 | | | | | | |
| Tax-Mortgage | 2,133.00 | 213,300.00 | CX 3022 | Basic | 1,066.50 | | |
| MAMAKATING | | | | | | Special Additional | 533.25 |
| | | | | Additional | 533.25 | Transfer | 0.00 |
| Tax Charge: | 2,133.00 | | | | | | |

---

## ** THIS PAGE IS PART OF THE INSTRUMENT **

I hereby certify that the within and foregoing was recorded in the Clerk's Office For:  Sullivan County, NY

**File Information:**
   Document Number:   2006- 00014127
   Receipt Number:   80581
   Recorded Date/Time:   October 31, 2006 10:47:57A
   Book-Vol/Pg:   Bk-REL  Vl-3242 Pg-385
   Cashier / Station:  K F  /  Cash Station 02

**Record and Return To:**
   EQUIFIRST CORPORATION
   ATTN: COLLATERAL. M
   500 FOREST PT CIRCLE
   CHARLOTTE NC 28273

*George L. Cooke*

**GEORGE L. COOKE**
**SULLIVAN COUNTY CLERK**

Return To:
Equi'First Corporation
Attn: Collateral M
500 Forest Point Circle
Charlotte, NC 28273


Prepared By:
Jennifer Kistler
500 Forest Point Circle
Charlotte, NC 28273


———————————— [Space Above This Line For Recording Data] ————————————

# MORTGAGE MIN 100200100107287710

## WORDS USED OFTEN IN THIS DOCUMENT

"Security Instrument." This document, which is dated October 20, 2006
with all Riders to this document, will be called the "Security Instrument."

"Borrower." William LeRoy and Charlene LeRoy, husband and wife
J.


whose address is 43 Aldow Street, Wurtsboro, NY 12790

sometimes will be called "Borrower" and sometimes simply "I" or "me."
(C) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is
acting solely as a nominee for Lender and Lender's successors and assigns. MERS is organized and
existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint,
MI 48501-2026, tel. (888) 679-MERS. FOR PURPOSES OF RECORDING THIS MORTGAGE,
MERS IS THE MORTGAGEE OF RECORD.
(D) "Lender." EquiFirst Corporation

will be called "Lender." Lender is a corporation or association which exists under the laws of
North Carolina                           . Lender's address is 500 Forest Point Circle,
Charlotte, NC 28273


| Section: | Block: | Lot: | Unit: |
|----------|--------|------|-------|
| 1072877  |        |      |       |

NEW YORK - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS        Form 3033 1/01

VMP-6A(NY) (0508)
Page 1 of 17                    Initials WL C L
VMP Mortgage Solutions, Inc. (800)521-7291

(J) **"Note."** The note signed by Borrower and dated  October 20, 2006              , will be called the "Note." The Note shows that I owe Lender  two hundred thirteen thousand three hundred and 00/100

Dollars (U.S. $ 213,300.00                )
plus interest and other amounts that may be payable. I have promised to pay this debt in Periodic Payments and to pay the debt in full by  November 1, 2036            .

(F) **"Property."** The property that is described below in the section titled "Description of the Property," will be called the "Property."

(G) **"Loan."** The "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

(H) **"Sums Secured."** The amounts described below in the section titled "Borrower's Transfer to Lender of Rights in the Property" sometimes will be called the "Sums Secured."

(I) **"Riders."** All Riders attached to this Security Instrument that are signed by Borrower will be called "Riders." The following Riders are to be signed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| [ ] Adjustable Rate Rider | [ ] Condominium Rider | [ ] Second Home Rider |
| [ ] Balloon Rider | [ ] Planned Unit Development Rider | [ ] 1-4 Family Rider |
| [ ] VA Rider | [ ] Biweekly Payment Rider | [X] Other(s) [specify] |
| | | ARM Floor Rider |

(J) **"Applicable Law."** All controlling applicable federal, state and local statutes, regulations, ordinances, administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable, judicial opinions will be called "Applicable Law."

(K) **"Community Association Dues, Fees, and Assessments."** All dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization will be called "Community Association Dues, Fees, and Assessments."

(L) **"Electronic Funds Transfer."** "Electronic Funds Transfer" means any transfer of money, other than by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Some common examples of an Electronic Funds Transfer are point-of-sale transfers (where a card such as an asset or debit card is used at a merchant), automated teller machine (or ATM) transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(M) **"Escrow Items."** Those items that are described in Section 3 will be called "Escrow Items."

(N) **"Miscellaneous Proceeds."** "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than Insurance Proceeds, as defined in, and paid under the coverage described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) Condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of Condemnation or sale to avoid Condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property. A taking of the Property by any governmental authority by eminent domain is known as "Condemnation."

(O) **"Mortgage Insurance."** "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(P) **"Periodic Payment."** The regularly scheduled amount due for (i) principal and interest under the Note, and (ii) any amounts under Section 3 will be called "Periodic Payment."

(Q) **"RESPA."** "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

1072877

Initials: _____




## BORROWER'S TRANSFER TO LENDER OF RIGHTS IN THE PROPERTY

I mortgage, grant and convey the Property to MERS (solely as nominee for Lender and Lender's successors in interest) and its successors in interest subject to the terms of this Security Instrument. This means that, by signing this Security Instrument, I am giving Lender those rights that are stated in this Security Instrument and also those rights that Applicable Law gives to lenders who hold mortgages on real property. I am giving Lender these rights to protect Lender from possible losses that might result if I fail to:

(A) Pay all the amounts that I owe Lender as stated in the Note including, but not limited to, all renewals, extensions and modifications of the Note;

(B) Pay, with interest, any amounts that Lender spends under this Security Instrument to protect the value of the Property and Lender's rights in the Property; and

(C) Keep all of my other promises and agreements under this Security Instrument and the Note.

I understand and agree that MERS holds only legal title to the rights granted by me in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right:

(A) to exercise any or all of those rights, including, but not limited to, the right to foreclose and sell the Property; and

(B) to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

## DESCRIPTION OF THE PROPERTY

I give MERS (solely as nominee for Lender and Lender's successors in interest) rights in the Property described in (A) through (G) below:

(A) The Property which is located at 43 Aldow Street

[Street]

Wurtsboro                   [City, Town or Village], New York  12790        [Zip Code].
This Property is in Sullivan                              County. It has the following legal
description: See Attached Exhibit A

(B) All buildings and other improvements that are located on the Property described in subsection (A) of this section;

(C) All rights in other property that I have as owner of the Property described in subsection (A) of this section. These rights are known as "easements and appurtenances attached to the Property;"

(D) All rights that I have in the land which lies in the streets or roads in front of, or next to, the Property described in subsection (A) of this section;

1072877



(E) All fixtures that are now or in the future will be on the Property described in subsections (A) and (B) of this section;

(F) All of the rights and property described in subsections (B) through (E) of this section that I acquire in the future; and

(G) All replacements of or additions to the Property described in subsections (B) through (F) of this section and all Insurance Proceeds for loss or damage to, and all Miscellaneous Proceeds of the Property described in subsections (A) through (F) of this section.

## BORROWER'S RIGHT TO MORTGAGE THE PROPERTY AND BORROWER'S OBLIGATION TO DEFEND OWNERSHIP OF THE PROPERTY

I promise that: (A) I lawfully own the Property; (B) I have the right to mortgage, grant and convey the Property to Lender; and (C) there are no outstanding claims or charges against the Property, except for those which are of public record.

I give a general warranty of title to Lender. This means that I will be fully responsible for any losses which Lender suffers because someone other than myself has some of the rights in the Property which I promise that I have. I promise that I will defend my ownership of the Property against any claims of such rights.

## PLAIN LANGUAGE SECURITY INSTRUMENT

This Security Instrument contains promises and agreements that are used in real property security instruments all over the country. It also contains other promises and agreements that vary in different parts of the country. My promises and agreements are stated in "plain language."

## COVENANTS

I promise and I agree with Lender as follows:

**1. Borrower's Promise to Pay.** I will pay to Lender on time principal and interest due under the Note and any prepayment, late charges and other amounts due under the Note. I will also pay all amounts for Escrow Items under Section 3 of this Security Instrument.

Payments due under the Note and this Security Instrument shall be made in U.S. currency. If any of my payments by check or other payment instrument is returned to Lender unpaid, Lender may require any payment be made by: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location required in the Note, or at another location designated by Lender under Section 15 of this Security Instrument. Lender may return or accept any payment or partial payment if it is for an amount that is less than the amount that is then due. If Lender accepts a lesser payment, Lender may refuse to accept a lesser payment that I may make in the future and does not waive any of its rights. Lender is not obligated to apply such lesser payments when it accepts such payments. If interest on principal accrues as if all Periodic Payments had been paid when due, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until I make payments to bring the Loan current. If I do not do so within a reasonable period of time, Lender will either apply such funds or return them to me. In the event of foreclosure, any unapplied funds will be applied to the outstanding principal balance immediately prior to foreclosure. No offset or claim which I might have now or in the future against Lender will relieve me from making payments due under the Note and this Security Instrument or keeping all of my other promises and agreements secured by this Security Instrument.

**2. Application of Borrower's Payments and Insurance Proceeds.** Unless Applicable Law or this Section 2 requires otherwise, Lender will apply each of my payments that Lender accepts in the following order:

First, to pay interest due under the Note;

Next, to pay principal due under the Note; and

Next, to pay the amounts due Lender under Section 3 of this Security Instrument.

Such payments will be applied to each Periodic Payment in the order in which it became due.

Any remaining amounts will be applied as follows:

First, to pay any late charges;

Next, to pay any other amounts due under this Security Instrument; and

Next, to reduce the principal balance of the Note.

1072877

If Lender receives a payment from me for a late Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the late Periodic Payment and the late charge. If more than one Periodic Payment is due, Lender may apply any payment received from me: First, to the repayment of the Periodic Payments that are due if, and to the extent that, each payment can be paid in full; Next, to the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due.

Voluntary prepayments will be applied as follows: First, to any prepayment charges; and Next, as described in the Note.

Any application of payments, Insurance Proceeds, or Miscellaneous Proceeds to principal due under the Note will not extend or postpone the due date of the Periodic Payments or change the amount of those payments.

**3. Monthly Payments For Taxes And Insurance.**

**(a) Borrower's Obligations.**

I will pay to Lender all amounts necessary to pay for taxes, assessments, water charges, sewer rents and other similar charges, ground leasehold payments or rents (if any), hazard or property insurance covering the Property, flood insurance (if any), and any required Mortgage Insurance, or a Loss Reserve as described in Section 10 in the place of Mortgage Insurance. Each Periodic Payment will include an amount to be applied toward payment of the following items which are called "Escrow Items:"

(1) The taxes, assessments, water charges, sewer rents and other similar charges, on the Property which under Applicable Law may be superior to this Security Instrument as a Lien on the Property. Any claim, demand or charge that is made against property because an obligation has not been fulfilled is known as a "Lien;"

(2) The leasehold payments or ground rents on the Property (if any);

(3) The premium for any and all insurance required by Lender under Section 5 of this Security Instrument;

(4) The premium for Mortgage Insurance (if any);

(5) The amount I may be required to pay Lender under Section 10 of this Security Instrument instead of the payment of the premium for Mortgage Insurance (if any); and

(6) If required by Lender, the amount for any Community Association Dues, Fees, and Assessments.

After signing the Note, or at any time during its term, Lender may include these amounts as Escrow Items. The monthly payment I will make for Escrow Items will be based on Lender's estimate of the annual amount required.

I will pay all of these amounts to Lender unless Lender tells me, in writing, that I do not have to do so, or unless Applicable Law requires otherwise. I will make these payments on the same day that my Periodic Payments of principal and interest are due under the Note.

The amounts that I pay to Lender for Escrow Items under this Section 3 will be called "Escrow Funds." I will pay Lender the Escrow Funds for Escrow Items unless Lender waives my obligation to pay the Escrow Funds for any or all Escrow Items. Lender may waive my obligation to pay to Lender Escrow Funds for any or all Escrow Items at any time. Any such waiver must be in writing. In the event of such waiver, I will pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Escrow Funds has been waived by Lender and, if Lender requires, will promptly send to Lender receipts showing such payment within such time period as Lender may require. My obligation to make such payments and to provide receipts will be considered to be a promise and agreement contained in this Security Instrument, as the phrase "promises and agreements" is used in Section 9 of this Security Instrument. If I am obligated to pay Escrow Items directly, pursuant to a waiver, and I fail to pay the amount due for an Escrow Item, Lender may pay that amount and I will then be obligated under Section 9 of this Security Instrument to repay to Lender. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 of this Security Instrument and, upon the revocation, I will pay to Lender all Escrow Funds, and in amounts, that are then required under this Section 3.

1072877



I promise to promptly send to Lender any notices that I receive of Escrow Item amounts to be paid. Lender will estimate from time to time the amount of Escrow Funds I will have to pay by using existing assessments and bills and reasonable estimates of the amount I will have to pay for Escrow Items in the future, unless Applicable Law requires Lender to use another method for determining the amount I am to pay.

Lender may, at any time, collect and hold Escrow Funds in an amount sufficient to permit Lender to apply the Escrow Funds at the time specified under RESPA. Applicable Law puts limits on the total amount of Escrow Funds Lender can at any time collect and hold. This total amount cannot be more than the maximum amount a lender could require under RESPA. If there is another Applicable Law that imposes a lower limit on the total amount of Escrow Funds Lender can collect and hold, Lender will be limited to the lower amount.

(b) Lender's Obligations.

Lender will keep the Escrow Funds in a savings or banking institution which has its deposits insured by a federal agency, instrumentality, or entity, or in any Federal Home Loan Bank. If Lender is such a savings or banking institution, Lender may hold the Escrow Funds. Lender will use the Escrow Funds to pay the Escrow Items no later than the time allowed under RESPA or other Applicable Law. Lender will give to me, without charge, an annual accounting of the Escrow Funds. That accounting will show all additions to and deductions from the Escrow Funds and the reason for each deduction.

Lender may not charge me for holding or keeping the Escrow Funds, for using the Escrow Funds to pay Escrow Items, for making a yearly analysis of my payment of Escrow Funds or for receiving, or for verifying and totaling assessments and bills. However, Lender may charge me for these services if Lender pays me interest on the Escrow Funds and if Applicable Law permits Lender to make such a charge. Lender will not be required to pay me any interest or earnings on the Escrow Funds unless either (1) Lender and I agree in writing that Lender will pay interest on the Escrow Funds, or (2) Applicable Law requires Lender to pay interest on the Escrow Funds.

(c) Adjustments to the Escrow Funds.

Under Applicable Law, there is a limit on the amount of Escrow Funds Lender may hold. If the amount of Escrow Funds held by Lender exceeds this limit, then there will be an excess amount and RESPA requires Lender to account to me in a special manner for the excess amount of Escrow Funds.

If, at any time, Lender has not received enough Escrow Funds to make the payments of Escrow Items when the payments are due, Lender may tell me in writing that an additional amount is necessary. I will pay to Lender whatever additional amount is necessary to pay the Escrow Items when the payments are due, but the number of payments will not be more than 12.

When I have paid all of the Sums Secured, Lender will promptly refund to me any Escrow Funds that are then being held by Lender.

4. Borrower's Obligation to Pay Charges, Assessments And Claims. I will pay all taxes, assessments, water charges, sewer rents and other similar charges, and any other charges and fines that may be imposed on the Property and that may be superior to this Security Instrument. I will also make ground rents or payments due under my lease if I am a tenant on the Property and Community Association Dues, Fees, and Assessments (if any) due on the Property. If these items are Escrow Items, I will do this by making the payments as described in Section 3 of this Security Instrument. In this Security Instrument, the word "Person" means any individual, organization, governmental authority or other party.

I will promptly pay or satisfy all Liens against the Property that may be superior to this Security Instrument. However, this Security Instrument does not require me to satisfy a superior Lien if: (a) I agree, in writing, to pay the obligation which gave rise to the superior Lien and Lender approves the way in which I agree to pay that obligation, but only so long as I am performing such agreement; (b) in good faith, I argue or defend against the superior Lien in a lawsuit so that in Lender's opinion, during the lawsuit, the superior Lien may not be enforced, but only until the lawsuit ends; or (c) I secure from the holder of that other Lien an agreement, approved in writing by Lender, that the Lien of this Security

1072877

 

Instrument is superior to the Lien held by that Person. If Lender determines that any part of the Property is subject to a superior Lien, Lender may give Borrower a notice identifying the superior Lien. Within 10 days of the date on which the notice is given, Borrower shall pay or satisfy the superior Lien or take one or more of the actions mentioned in this Section 4.

Lender also may require me to pay a one-time charge for an independent real estate tax reporting service used by Lender in connection with the Loan, unless Applicable Law does not permit Lender to make such a charge.

**5. Borrower's Obligation to Maintain Hazard Insurance or Property Insurance.** I will obtain hazard or property insurance to cover all buildings and other improvements that now are, or in the future will be, located on the Property. The insurance will cover loss or damage caused by fire, hazards normally covered by "Extended Coverage" hazard insurance policies, and any other hazards for which Lender requires coverage, including, but not limited to earthquakes and floods. The insurance will be in the amounts (including, but not limited to, deductible levels) and for the periods of time required by Lender. What Lender requires under the last sentence can change during the term of the Loan. I may choose the insurance company, but my choice is subject to Lender's right to disapprove. Lender may not disapprove my choice unless the disapproval is reasonable. Lender may require me to pay either (a) a one-time charge for flood zone determination, certification and tracking services, or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect the flood zone determination or certification. If I disagree with the flood zone determination, I may request the Federal Emergency Management Agency to review the flood zone determination and I promise to pay any fees charged by the Federal Emergency Management Agency for its review.

If I fail to maintain any of the insurance coverages described above, Lender may obtain insurance coverage, at Lender's option and my expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage will cover Lender, but might or might not protect me, my equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. I acknowledge that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that I could have obtained. Any amounts disbursed by Lender under this Section 5 will become my additional debt secured by this Security Instrument. These amounts will bear interest at the interest rate set forth in the Note from the date of disbursement and will be payable with such interest, upon notice from Lender to me requesting payment.

All of the insurance policies and renewals of those policies will include what is known as a "Standard Mortgage Clause" to protect Lender and will name Lender as mortgagee and/or as an additional loss payee. The form of all policies and renewals will be acceptable to Lender. Lender will have the right to hold the policies and renewal certificates. If Lender requires, I will promptly give Lender all receipts of paid premiums and renewal notices that I receive.

If I obtain any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy will include a Standard Mortgage Clause and will name Lender as mortgagee and/or as an additional loss payee.

If there is a loss or damage to the Property, I will promptly notify the insurance company and Lender. If I do not promptly prove to the insurance company that the loss or damage occurred, then Lender may do so.

The amount paid by the insurance company for loss or damage to the Property is called "Insurance Proceeds." Unless Lender and I otherwise agree in writing, any Insurance Proceeds, whether or not the underlying insurance was required by Lender, will be used to repair or to restore the damaged Property unless: (a) it is not economically feasible to make the repairs or restoration; (b) the use of the Insurance Proceeds for that purpose would lessen the protection given to Lender by this Security Instrument; or (c) Lender and I have agreed in writing not to use the Insurance Proceeds for that purpose. During the period

1072877

... any repairs or restorations are being made, Lender may hold any Insurance Proceeds until it has had an opportunity to inspect the Property to verify that the repair work has been completed to Lender's satisfaction. However, this inspection will be done promptly. Lender may make payments for the repairs and restorations in a single payment or in a series of progress payments as the work is completed. Unless Lender and I agree otherwise in writing or unless Applicable Law requires otherwise, Lender is not required to pay me any interest or earnings on the Insurance Proceeds. I will pay for any public adjusters or other third parties that I hire, and their fees will not be paid out of the Insurance Proceeds. If the repair or restoration is not economically feasible or if it would lessen Lender's protection under this Security Instrument, then the Insurance Proceeds will be used to reduce the amount that I owe to Lender under this Security Instrument. Such Insurance Proceeds will be applied in the order provided for in Section 2. If any of the Insurance Proceeds remain after the amount that I owe to Lender has been paid in full, the remaining Insurance Proceeds will be paid to me. .

If I abandon the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If I do not answer, within 30 days, a notice from Lender stating that the insurance company has offered to settle a claim, Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 of this Security Instrument or otherwise, I give Lender my rights to any Insurance Proceeds in an amount not greater than the amounts unpaid under the Note and this Security Instrument. I also give Lender any other of my rights (other than the right to any refund of unearned premiums that I paid) under all insurance policies covering the Property, if the rights are applicable to the coverage of the Property. Lender may use the Insurance Proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or Security Instrument, whether or not then due.

6.  **Borrower's Obligations to Occupy The Property.** I will occupy the Property and use the Property as my principal residence within 60 days after I sign this Security Instrument. I will continue to occupy the Property and to use the Property as my principal residence for at least one year. The one-year period will begin when I first occupy the Property. However, I will not have to occupy the Property and use the Property as my principal residence within the time frames set forth above if Lender agrees in writing that I do not have to do so. Lender may not refuse to agree unless the refusal is reasonable. I also will not have to occupy the Property and use the Property as my principal residence within the time frames set forth above if extenuating circumstances exist which are beyond my control.

7.  **Borrower's Obligations to Maintain And Protect The Property And to Fulfill Any Lease Obligations.**

(a) Maintenance and Protection of the Property.

I will not destroy, damage or harm the Property, and I will not allow the Property to deteriorate. Whether or not I am residing in the Property, I will keep the Property in good repair so that it will not deteriorate or decrease in value due to its condition. Unless it is determined under Section 5 of this Security Instrument that repair is not economically feasible, I will promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or Condemnation (as defined in the definition of Miscellaneous Proceeds) proceeds are paid because of loss or damage to, or Condemnation of, the Property, I will repair or restore the Property only if Lender has released those proceeds for such purposes. Lender may pay for the repairs and restoration out of proceeds in a single payment or in a series of progress payments as the work is completed. If the insurance or Condemnation proceeds are not sufficient to repair or restore the Property, I promise to pay for the completion of such repair or restoration.

(b) Lender's Inspection of Property.

Lender, and others authorized by Lender, may enter on and inspect the Property. They will do so in a reasonable manner and at reasonable times. If it has a reasonable purpose, Lender may inspect the inside of the home or other improvements on the Property. Before or at the time an inspection is made, Lender will give me notice stating a reasonable purpose for such interior inspection.

1072877

**8. Borrower's Loan Application.** If, during the application process for the Loan, I, or any Person or entity acting at my direction or with my knowledge or consent, made false, misleading, or inaccurate statements to Lender about information important to Lender in determining my eligibility for the Loan (or did not provide Lender with such information), Lender will treat my actions as a default under this Security Instrument. False, misleading, or inaccurate statements about information important to Lender would include a misrepresentation of my intention to occupy the Property as a principal residence. This is just one example of a false, misleading, or inaccurate statement of important information.

**9. Lender's Right to Protect Its Rights in The Property.** If: (a) I do not keep my promises and agreements made in this Security Instrument; (b) someone, including me, begins a legal proceeding that may significantly affect Lender's interest in the Property or rights under this Security Instrument (such as a legal proceeding in bankruptcy, in probate, for Condemnation or Forfeiture (as defined in Section 11), proceedings which could give a Person rights which could equal or exceed Lender's interest in the Property or under this Security Instrument, proceedings for enforcement of a Lien which may become superior to this Security Instrument, or to enforce laws or regulations); or (c) I have abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and Lender's rights under this Security Instrument.

Lender's actions may include, but are not limited to: (a) protecting and/or assessing the value of the Property; (b) securing and/or repairing the Property; (c) paying sums to eliminate any Lien against the Property that may be equal or superior to this Security Instrument; (d) appearing in court; and (e) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Lender can also enter the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, have utilities turned on or off, and take any other action to secure the Property. Although Lender may take action under this Section 9, Lender does not have to do so and is under no duty to do so. I agree that Lender will not be liable for not taking any or all actions under this Section 9.

I will pay to Lender any amounts, with interest, which Lender spends under this Section 9. I will pay those amounts to Lender when Lender sends me a notice requesting that I do so. I will pay interest on those amounts at the interest rate set forth in the Note. Interest on each amount will begin on the date that the amount is spent by Lender. This Security Instrument will protect Lender in case I do not keep this promise to pay those amounts with interest.

If I do not own, but am a tenant on the Property, I will fulfill all my obligations under my lease. I also agree that, if I acquire the full title (sometimes called "Fee Title") to the Property, my lease interest and the Fee Title will not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, I will pay the premiums for the Mortgage Insurance. If, for any reason, the Mortgage Insurance coverage ceases to be available from the mortgage insurer that previously provided such insurance and Lender required me to make separate payments toward the premiums for Mortgage Insurance, I will pay the premiums for substantially equivalent Mortgage Insurance coverage from an alternate mortgage insurer. However, the cost of this Mortgage Insurance coverage will be substantially equivalent to the cost to me of the previous Mortgage Insurance coverage, and the alternate mortgage insurer will be selected by Lender.

If substantially equivalent Mortgage Insurance coverage is not available, Lender will establish a non-refundable "Loss Reserve" as a substitute for the Mortgage Insurance coverage. I will continue to pay to Lender each month an amount equal to one-twelfth of the yearly Mortgage Insurance premium (as of the time the coverage lapsed or ceased to be in effect). Lender will retain these payments, and will use these payments to pay for losses that the Mortgage Insurance would have covered. The Loss Reserve is non-refundable even if the Loan is ultimately paid in full and Lender is not required to pay me any interest on the Loss Reserve. Lender can no longer require Loss Reserve payments if: (a) Mortgage Insurance

1072877



coverage again becomes available through an insurer selected by Lender; (b) such Mortgage Insurance is obtained; (c) Lender requires separately designated payments toward the premiums for Mortgage Insurance; and (d) the Mortgage Insurance coverage is in the amount and for the period of time required by Lender.

If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separate payments toward the premiums for Mortgage Insurance, I will pay the Mortgage Insurance premiums, or the Loss Reserve payments, until the requirement for Mortgage Insurance ends according to any written agreement between Lender and me providing for such termination or until termination of Mortgage Insurance is required by Applicable Law. Lender may require me to pay the premiums, or the Loss Reserve payments, in the manner described in Section 3 of this Security Instrument. Nothing in this Section 10 will affect my obligation to pay interest at the rate provided in the Note.

A Mortgage Insurance policy pays Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance policy.

Mortgage insurers assess their total risk on all Mortgage Insurance from time to time. Mortgage insurers may enter into agreements with other parties to share or change their risk, or to reduce losses. These agreements are based on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include Mortgage Insurance premiums).

As a result of these agreements, Lender, any owner of the Note, another insurer, any reinsurer, or ... other entity may receive (directly or indirectly) amounts that come from a portion of Borrower's ... ints for Mortgage Insurance, in exchange for sharing or changing the mortgage insurer's risk, or ... g losses. If these agreements provide that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." It also should be understood that: (a) any of these agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. These agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund; and (b) any of these agreements will not affect the rights Borrower has - if any - regarding the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right (a) to receive certain disclosures, (b) to request and obtain cancellation of the Mortgage Insurance, (c) to have the Mortgage Insurance terminated automatically, and/or (d) to receive a refund of any Mortgage Insurance premiums that were not earned at the time of such cancellation or termination.

11.  Agreements About Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are assigned to and will be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds will be applied to restoration or repair of the Property, if (a) the restoration or repair is economically feasible, and (b) Lender's security given in this Security Instrument is not lessened. During such repair and restoration period, Lender will have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect the Property to verify that the work has been completed to Lender's satisfaction. However, the inspection will be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless Lender and I agree otherwise in writing or unless Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender will not be required to pay Borrower any interest or earnings on the Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security given in this Security Instrument would be lessened, the Miscellaneous Proceeds will be applied to the Sums Secured, whether or not then due. The excess, if any, will be paid to me. Such Miscellaneous Proceeds will be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds will be applied to the Sums Secured, whether or not then due. The excess, if any, will be paid to me.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the Sums Secured immediately before the partial taking, destruction, or loss in

1072877

Initials: WLC

value, the Sums Secured will be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the Sums Secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to me.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the Sums Secured immediately before the partial taking, destruction, or loss in value, the Miscellaneous Proceeds will be applied to the Sums Secured whether or not the sums are then due.

If I abandon the Property, or if, after Lender sends me notice that the Opposing Party (as defined in the next sentence) offered to make an award to settle a claim for damages, I fail to respond to Lender within 30 days after the date Lender gives notice, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the Sums Secured, whether or not then due. "Opposing Party" means the third party that owes me Miscellaneous Proceeds or the party against whom I have a right of action in regard to Miscellaneous Proceeds.

I will be in default under this Security Instrument if any civil or criminal action or proceeding that Lender determines could result in a court ruling (a) that would require Forfeiture of the Property, or (b) that could damage Lender's interest in the Property or rights under this Security Instrument. "Forfeiture" is a court action to require the Property, or any part of the Property, to be given up. I may correct the default by obtaining a court ruling that dismisses the court action, if Lender determines that this court ruling prevents Forfeiture of the Property and also prevents any damage to Lender's interest in the Property or rights under this Security Instrument. If I correct the default, I will have the right to have enforcement of this Security Instrument discontinued, as provided in Section 19 of this Security Instrument, even if Lender required Immediate Payment in Full (as defined in Section 22). The proceeds of any award or claim for ...ges that are attributable to the damage or reduction of Lender's interest in the Property are assigned, and will be paid, to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property will be applied in the order provided for in Section 2.

12. Continuation of Borrower's Obligations And of Lender's Rights.

(a) Borrower's Obligations.

Lender may allow me, or a Person who takes over my rights and obligations, to delay or to change the amount of the Periodic Payments. Even if Lender does this, however, I will still be fully obligated under the Note and under this Security Instrument unless Lender agrees to release me, in writing, from my obligations.

Lender may allow those delays or changes for me or a Person who takes over my rights and obligations, even if Lender is requested not to do so. Even if Lender is requested to do so, Lender will not be required to (1) bring a lawsuit against me or such a Person for not fulfilling obligations under the Note or under this Security Instrument, or (2) refuse to extend time for payment or otherwise modify amortization of the Sums Secured.

(b) Lender's Rights.

Even if Lender does not exercise or enforce any right of Lender under this Security Instrument or under Applicable Law, Lender will still have all of those rights and may exercise and enforce them in the future. Even if: (1) Lender obtains insurance, pays taxes, or pays other claims, charges or Liens against the Property; (2) Lender accepts payments from third Persons; or (3) Lender accepts payments in amounts less than the amount then due, Lender will have the right under Section 22 below to demand that I make Immediate Payment in Full of any amounts remaining due and payable to Lender under the Note and under this Security Instrument.

13. Obligations of Borrower And of Persons Taking Over Borrower's Rights or Obligations. If more than one Person signs this Security Instrument as Borrower, each of us is fully obligated to keep all of Borrower's promises and obligations contained in this Security Instrument. Lender may enforce Lender's rights under this Security Instrument against each of us individually or against all of us together. This means that any one of us may be required to pay all of the Sums Secured. However, if one of us does not sign the Note: (a) that Person is signing this Security Instrument only to give that Person's rights in the Property to Lender under the terms of this Security Instrument; (b) that Person is not personally obligated to pay the Sums Secured; and (c) that Person agrees that Lender may agree with the other Borrowers to

1072877

-6A(NY) (0508)                    Page 11 of 17        Initials: _____        Form 3033 1/01

delay enforcing any of Lender's rights, to modify, or make any accommodations with regard to the terms of this Security Instrument or the Note without that Person's consent.

Subject to the provisions of Section 18 of this Security Instrument, any Person who takes over my rights or obligations under this Security Instrument in writing, and is approved by Lender in writing, will have all of my rights and will be obligated to keep all of my promises and agreements made in this Security Instrument. Borrower will not be released from Borrower's obligations and liabilities under this Security Instrument unless Lender agrees to such release in writing. Any Person who takes over Lender's rights or obligations under this Security Instrument will have all of Lender's rights and will be obligated to keep all of Lender's promises and agreements made in this Security Instrument except as provided under Section 20.

**14. Loan Charges.** Lender may charge me fees for services performed in connection with my default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. With regard to other fees, the fact that this Security Instrument does not expressly indicate that Lender may charge a certain fee does not mean that Lender cannot charge that fee. Lender may not charge fees that are prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to Applicable Law which sets maximum loan charges, and that Applicable Law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed permitted limits: (a) any such loan charge will be reduced by the amount necessary to r~ 'uce the charge to the permitted limit; and (b) any sums already collected from me which exceeded p~ mitted limits will be refunded to me. Lender may choose to make this refund by reducing the principal ~ ~i under the Note or by making a direct payment to Borrower. If a refund reduces principal, the ~:tion will be treated as a partial prepayment without any prepayment charge (even if a prepayment ~e is provided for under the Note). If I accept such a refund that is paid directly to me, I will waive any right to bring a lawsuit against Lender because of the overcharge.

**15. Notices Required under this Security Instrument.** All notices given by me or Lender in connection with this Security Instrument will be in writing. Any notice to me in connection with this Security Instrument is considered given to me when mailed by first class mail or when actually delivered to my notice address if sent by other means. Notice to any one Borrower will be notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address is the address of the Property unless I give notice to Lender of a different address. I will promptly notify Lender of my change of address. If Lender specifies a procedure for reporting my change of address, then I will only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender will be given by delivering it or by mailing it by first class mail to Lender's address stated on the first page of this Security Instrument unless Lender has given me notice of another address. Any notice in connection with this Security Instrument is given to Lender when it is actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Law That Governs this Security Instrument; Word Usage.** This Security Instrument is governed by federal law and the law of New York State. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might allow the parties to agree by contract or it might be silent, but such silence does not mean that Lender and I cannot agree by contract. If any term of this Security Instrument or of the Note conflicts with Applicable Law, the conflict will not affect other provisions of this Security Instrument or the Note which can operate, or be given effect, without the conflicting provision. This means that the Security Instrument or the Note will remain as if the conflicting provision did not exist.

As used in this Security Instrument: (a) words of the masculine gender mean and include corresponding words of the feminine and neuter genders; (b) words in the singular mean and include the plural, and words in the plural mean and include the singular; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** I will be given one copy of the Note and of this Security Instrument.

**18. Agreements about Lender's Rights If the Property Is Sold or Transferred.** Lender may require Immediate Payment in Full of all Sums Secured by this Security Instrument if all or any part of the Property, or if any right in the Property, is sold or transferred without Lender's prior written permission.

1072877

-6A(NY) (0508)                    Page 12 of 17          Initials: _____          Form 3033 1/01

If Borrower is not a natural Person and a beneficial interest in Borrower is sold or transferred without Lender's prior written permission, Lender also may require Immediate Payment in Full. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender requires Immediate Payment in Full under this Section 18, Lender will give me a notice which states this requirement. The notice will give me at least 30 days to make the required payment. The 30-day period will begin on the date the notice is given to me in the manner required by Section 15 of this Security Instrument. If I do not make the required payment during that period, Lender may act to enforce its rights under this Security Instrument without giving me any further notice or demand for payment.

**19. Borrower's Right to Have Lender's Enforcement of this Security Instrument Discontinued.** Even if Lender has required Immediate Payment in Full, I may have the right to have enforcement of this Security Instrument stopped. I will have this right at any time before the earliest of: (a) five days before sale of the Property under any power of sale granted by this Security Instrument; (b) another period as Applicable Law might specify for the termination of my right to have enforcement of the Loan stopped; or (c) a judgment has been entered enforcing this Security Instrument. In order to have this right, I will meet the following conditions:

(a) I pay to Lender the full amount that then would be due under this Security Instrument and the Note as if Immediate Payment in Full had never been required;

(b) I correct my failure to keep any of my other promises or agreements made in this Security Instrument;

(c) I pay all of Lender's reasonable expenses in enforcing this Security Instrument including, for example, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and

(d) I do whatever Lender reasonably requires to assure that Lender's interest in the Property and rights under this Security Instrument and my obligations under the Note and under this Security Instrument continue unchanged.

Lender may require that I pay the sums and expenses mentioned in (a) through (d) in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer.

If I fulfill all of the conditions in this Section 19, then this Security Instrument will remain in full effect as if Immediate Payment in Full had never been required. However, I will not have the right to have Lender's enforcement of this Security Instrument discontinued if Lender has required Immediate Payment in Full under Section 18 of this Security Instrument.

**20. Note Holder's Right to Sell the Note or an Interest in the Note; Borrower's Right to Notice of Change of Loan Servicer; Lender's and Borrower's Right to Notice of Grievance.** The Note, or an interest in the Note, together with this Security Instrument, may be sold one or more times. I might not receive any prior notice of these sales.

The entity that collects the Periodic Payments and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law is called the "Loan Servicer." There may be a change of the Loan Servicer as a result of the sale of the Note. There also may be one or more changes of the Loan Servicer unrelated to a sale of the Note. Applicable Law requires that I be given written notice of any change of the Loan Servicer. The notice will state the name and address of the new Loan Servicer, and also tell me the address to which I should make my payments. The notice also will contain any other information required by RESPA or Applicable Law. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to me will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither I nor Lender may commence, join or be joined to any court action (as either an individual party or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other has not fulfilled any of its obligations under this Security Instrument, unless the other is notified (in the manner required under Section 15 of this Security Instrument) of the unfulfilled obligation and given a reasonable time period to take corrective action. If

1072877

Applicable Law provides a time period which will elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to me under Section 22 and the notice of the demand for payment in full given to me under Section 22 will be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20. All rights under this paragraph are subject to Applicable Law.

**21. Continuation of Borrower's Obligations to Maintain and Protect the Property.** The federal laws and the laws of New York State that relate to health, safety or environmental protection are called "Environmental Law." Environmental Law classifies certain substances as toxic or hazardous. There are other substances that are considered hazardous for purposes of this Section 21. These substances are gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials. The substances defined as toxic or hazardous by Environmental Law and the substances considered hazardous for purposes of this Section 21 are called "Hazardous Substances." "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law. An "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

I will not do anything affecting the Property that violates Environmental Law, and I will not allow anyone else to do so. I will not cause or permit Hazardous Substances to be present on the Property. I will not use or store Hazardous Substances on the Property. I also will not dispose of Hazardous Substances on Property, or release any Hazardous Substance on the Property, and I will not allow anyone else to do so also will not do, nor allow anyone else to do, anything affecting the Property that: (a) is in violation of any Environmental Law; (b) creates an Environmental Condition; or (c) which, due to the presence, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The promises in this paragraph do not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized as appropriate for normal residential use and maintenance of the Property (including, but not limited to, Hazardous Substances in consumer products). I may use or store these small quantities on the Property. In addition, unless Environmental Law requires removal or other action, the buildings, the improvements and the fixtures on the Property are permitted to contain asbestos and asbestos-containing materials if the asbestos and asbestos-containing materials are undisturbed and "non-friable" (that is, not easily crumbled by hand pressure).

I will promptly give Lender written notice of: (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which I have actual knowledge; (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance; and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If I learn, or any governmental or regulatory authority, or any private party, notifies me that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, I will promptly take all necessary remedial actions in accordance with Environmental Law.

Nothing in this Security Instrument creates an obligation on Lender for an Environmental Cleanup.

**NON-UNIFORM COVENANTS**

I also promise and agree with Lender as follows:

**22. Lender's Rights If Borrower Fails to Keep Promises and Agreements. Except as provided in Section 18 of this Security Instrument, if all of the conditions stated in subsections (a), (b) and (c) of this Section 22 are met, Lender may require that I pay immediately the entire amount then remaining unpaid under the Note and under this Security Instrument. Lender may do this without making any further demand for payment. This requirement is called "Immediate Payment in Full."**

**If Lender requires Immediate Payment in Full, Lender may bring a lawsuit to take away all of my remaining rights in the Property and have the Property sold. At this sale Lender or another**

1072877



Person may acquire the Property. This is known as "Foreclosure and Sale." In any lawsuit for Foreclosure and Sale, Lender will have the right to collect all costs and disbursements and additional allowances allowed by Applicable Law and will have the right to add all reasonable attorneys' fees to the amount I owe Lender, which fees shall become part of the Sums Secured.

Lender may require Immediate Payment in Full under this Section 22 only if all of the following conditions are met:

(a) I fail to keep any promise or agreement made in this Security Instrument or the Note, including, but not limited to, the promises to pay the Sums Secured when due, or if another default occurs under this Security Instrument;

(b) Lender sends to me, in the manner described in Section 15 of this Security Instrument, a notice that states:

(1) The promise or agreement that I failed to keep or the default that has occurred;

(2) The action that I must take to correct that default;

(3) A date by which I must correct the default. That date will be at least 30 days from the date on which the notice is given;

(4) That if I do not correct the default by the date stated in the notice, Lender may require Immediate Payment in Full, and Lender or another Person may acquire the Property by means of Foreclosure and Sale;

(5) That if I meet the conditions stated in Section 19 of this Security Instrument, I will have the right to have Lender's enforcement of this Security Instrument stopped and to have the Note and this Security Instrument remain fully effective as if Immediate Payment in Full had never been required; and

(6) That I have the right in any lawsuit for Foreclosure and Sale to argue that I did keep my promises and agreements under the Note and under this Security Instrument, and to present any other defenses that I may have; and

(c) I do not correct the default stated in the notice from Lender by the date stated in that notice.

23. Lender's Obligation to Discharge this Security Instrument. When Lender has been paid all amounts due under the Note and under this Security Instrument, Lender will discharge this Security Instrument by delivering a certificate stating that this Security Instrument has been satisfied. I will pay all costs of recording the discharge in the proper official records. I agree to pay a fee for the discharge of this Security Instrument, if Lender so requires. Lender may require that I pay such a fee, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted by Applicable Law.

24. Agreements about New York Lien Law. I will receive all amounts lent to me by Lender subject to the trust fund provisions of Section 13 of the New York Lien Law. This means that I will: (a) hold all amounts which I receive and which I have a right to receive from Lender under the Note as a trust fund; and (b) use those amounts to pay for "Cost of Improvement" (as defined in Section 13 of the New York Lien Law) before I use them for any other purpose. The fact that I am holding those amounts as a trust fund means that for any building or other improvement located on the Property I have a special responsibility under the law to use the amount in the manner described in this Section 24.

25. Borrower's Statement Regarding the Property [check box as applicable].

[X] This Security Instrument covers real property improved, or to be improved, by a one or two family dwelling only.

[X] This Security Instrument covers real property principally improved, or to be improved, by one or more structures containing, in the aggregate, not more than six residential dwelling units with each dwelling unit having its own separate cooking facilities.

[ ] This Security Instrument does not cover real property improved as described above.

1072877

VMP-6A(NY) (0506)          Page 15 of 17          Initials: [handwritten]          Form 3033 1/01

BY SIGNING BELOW, I accept and agree to the promises and agreements contained in pages 1 through 17 of this Security Instrument and in any Rider signed by me and recorded with it.

Witnesses:

_____        _____ (Seal)
                                          William J Leroy                  -Borrower

_____        _____ (Seal)
                                          Charlene Leroy                   -Borrower

_____ (Seal)  _____ (Seal)
                        -Borrower                                   -Borrower

_____ (Seal)  _____ (Seal)
                        -Borrower                                   -Borrower

_____ (Seal)  _____ (Seal)
                        -Borrower                                   -Borrower

1072877

VMP-6A(NY) (0503)              Page 16 of 17              Form 3033 1/01

**STATE OF NEW YORK,**

County ss: Sullivan

On the 20th day of October, 2006 before me, the undersigned, a notary public in and for said state, personally appeared William J Leroy & Charlene Leroy

personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

Notary Public

Tax Map Information: 3473

Lynn M. Mindel
Notary Public-State of New York
no. 01MI6100100
Qualified in Dutchess County
Commission expires 10/14/07

1072877

-6A(NY) (0508)                    Page 17 of 17            Initials                    Form 3033 1/01

## VERIFICATION

STATE OF NEW YORK          :
                          : SS.
COUNTY OF MONROE          :

I, Frank M. Cassara, being duly sworn, depose and say:

That I am an associate of Shapiro & DiCaro, LLP, attorneys for the Plaintiff in the above entitled action with offices located at 250 Mile Crossing Boulevard, Suite One, Rochester, County of Monroe, State of New York; that I have read the foregoing complaint and know the contents thereof; that the same is true to my own knowledge except as to the matters stated to be upon information and belief, and that as to those matters I believe them to be true.

That the reason this verification is made by deponent instead of the Plaintiff is because the Plaintiff is not within the County of Monroe, which is the county where I have my office. Deponent further says that the grounds of my belief as to all matters in the complaint not stated to be upon my knowledge are based upon the books and records of Plaintiff.

Frank M. Cassara, Esq.

Sworn to before me this

13 day of February, 2008

Notary Public

MELISA M. JORDAN
Notary Public, State of New York
No. 01JO6116910
Qualified in Monroe County
Commission Expires Oct. 12, 2008

## CERTIFICATION BY ATTORNEY

I, Frank M. Cassara, am an attorney duly admitted to the practice of law in the State of New York. I am an associate of Shapiro & DiCaro, LLP, the attorneys for Plaintiff, Equifirst Corporation, in the above captioned civil action.

I HEREBY CERTIFY, pursuant to Sec. 130-1.1-a of the Rules of the Chief Administrator (22 NYCRR), to the best of my knowledge, information and belief, formed after an inquiry reasonable under the circumstances, that the presentation of the Summons and Complaint in this action, or the contentions therein, are not frivolous as defined in subsection (c) of Sec. 130-1.1 of the Rules of the Chief Administrator (22NYCRR).

Dated: February 13, 2008

Frank M. Cassara, Esq.
SHAPIRO & DICARO, LLP
250 Mile Crossing Boulevard

STATE OF NEW YORK  } ss.:
Sullivan County Clerk's Office }

I, Daniel L. Briggs, County Clerk in and for said County, do hereby certify that I have compared the foregoing copy of a __mortgage Foreclosure Complaint for Index # 492-08__ with the original now remaining on __File__ in this office and that the same is a correct transcript therefrom and of the whole of said original.

ENDORSED, FILED.

february 14, 2008
Daniel L. Briggs
Clerk

In testimony whereof, I have hereunto set my hand and affixed the seal of said County this __16th__ day of __April__ A.D. __2008__.

Daniel L. Briggs
, Clerk

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF SULLIVAN

_____

Equifirst Corporation,

                          Plaintiff,

          -against-

William J. LeRoy a/k/a William Leroy; Charlene LeRoy
a/k/a Charlene Leroy, and "JOHN DOE #1" through "JOHN
DOE #10", the last ten names being fictitious and unknown
to the Plaintiff, the person or parties intended being the
person or parties, if any, having or claiming an interest in or
lien upon the mortgaged premises described in the complaint,

                          Defendants.

_____

**SUMMONS AND NOTICE**

Index No. 492 07

Date Filed: 2/14/08

---

PROPERTY ADDRESS:   43 Aldow Street, Wurtsboro, NY 12790

---

**TO THE ABOVE NAMED DEFENDANTS:**

          **YOU ARE HEREBY SUMMONED** to answer the complaint in this action and to serve

a copy of your answer, or a notice of appearance on the attorneys for the Plaintiff within thirty

(30) days after the service of this summons, exclusive of the day of service.  The United States of

America, if designated as a defendant in this action, may appear within sixty (60) days of service

hereof.  In case of your failure to appear or answer, judgment will be taken against you by

default for the relief demanded in the complaint.

          **NOTICE OF NATURE OF ACTION AND RELIEF SOUGHT THE OBJECT** of

the above captioned action is to foreclose a Mortgage to secure $213,300.00 and interest,

recorded in the Sullivan County Clerk's Office on October 31, 2003, in Vol. 3242 of Mortgages,

page 385 covering premises known as 43 Aldow Street, Wurtsboro, NY 12790.

The relief sought in the within action is a final judgment directing the sale of the premises

described above to satisfy the debt secured by the Mortgage described above.

Plaintiff designates Sullivan County as the place of trial. Venue is based upon the

County in which the mortgaged premises is situated.

### NOTICE
### YOU ARE IN DANGER OF LOSING YOUR HOME

IF YOU DO NOT RESPOND TO THIS SUMMONS AND COMPLAINT BY
SERVING A COPY OF THE ANSWER ON THE ATTORNEY FOR THE MORTGAGE
COMPANY WHO FILED THIS FORECLOSURE PROCEEDING AGAINST YOU AND
FILING THE ANSWER WITH THE COURT, A DEFAULT JUDGMENT MAY BE
ENTERED AND YOU CAN LOSE YOUR HOME.

SPEAK TO AN ATTORNEY OR GO TO THE COURT WHERE YOUR CASE IS
G FOR FURTHER INFORMATION ON HOW TO ANSWER THE SUMMONS
PROTECT YOUR PROPERTY.

SENDING A PAYMENT TO YOUR MORTGAGE COMPANY WILL NOT STOP
THIS FORECLOSURE ACTION.

YOU MUST RESPOND BY SERVING A COPY OF THE ANSWER ON THE
ATTORNEY FOR THE PLAINTIFF (MORTGAGE COMPANY) AND FILING THE
ANSWER WITH THE COURT.

Dated: Fe'

STATE OF NEW YORK } ss.:
Sullivan County Clerk's Office }

I, Daniel L. Briggs, County Clerk in and for said County, do hereby certify
that I have compared the foregoing copy of a _Summons and_
_Notice for Index #492-07_____
with the original now remaining on _____File_____ in this office and
that the same is a correct transcript therefrom and of the whole of said original.

**ENDORSED, FILED.**

_February 14, 2008_

_Daniel L. Briggs_
                    Clerk

In testimony whereof, I have hereunto set my hand and affixed the seal of
said County this _10th_ day of _April_____
A.D., _2008._

_Daniel L. Briggs_
                              , Clerk

WE ARE ATTEMPTING TO COLLECT A DEBT AND ANY INFORMATION OBTAINED WILL BE USED
FOR THAT PURPOSE.

SUPREME COURT STATE OF NEW YORK
COUNTY OF SULLIVAN

| | |
|---|---|
| Equifirst Corporation,<br><br>         Plaintiff,<br><br> -against-<br><br>William J. LeRoy a/k/a William Leroy,<br>Charlene LeRoy a/k/a Charlene Leroy,<br>and "JOHN DOE #1" through "JOHN<br>DOE #10", the last ten names being<br>fictitious and unknown to the Plaintiff, the<br>person or parties intended being the<br>person or parties, if any, having or<br>claiming an interest in or lien upon the<br>mortgaged premises described in the<br>complaint,<br><br>         Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Index No. 08-492

**ANSWER TO MORTGAGE
FORECLOSURE COMPLAINT**

Defendants William J. LeRoy and Charlene LeRoy ("Defendants"), for their answer to

the complaint herein, show as follows:

## FACTUAL ALLEGATIONS COMMON TO ALL DEFENSES
## AND COUNTERCLAIMS

  1. In September 2006, mortgage broker America's Mortgage Broker, L.L.C., a/k/a

AMB, d/b/a Funding America Mortgage ("AMB"), by one Owen Quinn, solicited Charlene

LeRoy by telephone to refinance the home she owns jointly with her husband, William J. LeRoy.

  2. This was a cold call, i.e., Mrs. LeRoy had not previously contacted AMB to look

into refinancing her home.

  3. Mrs. LeRoy told Owen Quinn that she was not interested in his solicitation, as she

and her husband had recently applied to refinance their home with another lender without

success.

  4. Mrs. LeRoy further told Mr. Quinn that two (2) appraisals done on their home in

connection with that recent prior loan application did not yield a property value high enough for

the loan they sought.

5.    Mr. Quinn thereupon represented to Mrs. LeRoy that he had extensive experience working with a real estate appraiser in Rochester New York, where Mr. Quinn's office was located.

6.    Mr. Quinn stated that he was confident that this appraiser could do a good job appraising their home and help get them a new loan.

7.    Mr. Quinn further stated that the appraiser could be there the next day, and that Mrs. LeRoy should present him with a check for his work in the amount of $400.00

8.    Mrs. LeRoy again declined, stating that she had recently paid for two (2) appraisals already, and wasn't about to throw away the money for a third.

9.    Mr. Quinn then stated that if Mrs. LeRoy would pay half of the proposed appraisal fee, or $200.00, then Mr. Quinn (or AMB) would pay the other $200.00.

10.    Mrs. LeRoy agreed to this proposal.

11.    On information and belief, Mr. Quinn took the information for the LeRoy's mortgage loan application over the telephone, including information regarding their incomes.

12.    On information and belief, Mr. Quinn solicited and obtained the LeRoy's consent to pull their credit reports for submission to a mortgage loan originator, along with their loan application.

13.    Mr. LeRoy, who is chronically and seriously ill, drives a truck for the New York State Thruway Authority.

14.    Mrs. LeRoy is permanently disabled. Her sole sources of income, other than her husband's wages, are workers' compensation benefits and Social Security Disability ("SSD") payments.

15.    During this initial telephone conversation with the LeRoy's, Mrs. LeRoy informed Mr. Quinn about Mrs. LeRoy's disability and Mr. LeRoy's illness.

16.    The appraiser sent by AMB was Robert Valerio.

17.    On information and belief, Robert Valerio was on a list of approved appraisers maintained or otherwise used by EquiFirst.

18.    Mr. Valerio arrived at the LeRoy residence at approximately 7:00 p.m. the following night. He inspected the interior of the residence and spoke with the LeRoy's.

19.    Since it was too dark for him to take exterior photographs of the LeRoy's home, Mr. Valerio asked the LeRoy's son to take such pictures the following day, and then to email the photos to him for inclusion in the appraisal.

20.    Mr. Valerio then left the LeRoy's home.

21.    The following day, the LeRoy's son took and then transmitted the requested photographs to Mr. Valerio.

22.    Within one or two days after Mr. Valerio arrived at the LeRoy residence, Mrs. LeRoy received another phone call from Mr. Quinn.

23.    Mr. Quinn represented that he had seen the appraisal photos and that their home was beautiful.

24.    Mr. Quinn stated that the appraiser had valued their home at $237,000.00, and accordingly would support a refinance of $213,000.00, sufficient for the LeRoy's needs.

25.    Mr. Quinn further represented in that phone conversation that he could get the LeRoy's into a fixed-rate mortgage loan for this amount in the range of seven percent (7%) annual interest.

26.    The LeRoy's were gratified at this outcome, and agreed to go forward with the processing of their loan application.

27. The LeRoy's signed a loan application prepared by Mr. Quinn dated 9/29/2006, which correctly listed and separated each of their incomes, including Mrs. LeRoy's worker's compensation benefits.

28. On information and belief, based upon correspondence from an executive officer of AMB addressed to the New York State Banking Department, AMB submitted this application to EquiFirst to support a full-documentation, subprime loan application.

29. The LeRoy's believe, and therefore allege, that Mrs. LeRoy's worker's compensation income, set forth in the first, correctly filled-out loan application, did not count toward household income for EquiFirst's subprime mortgage loan underwriting guidelines because it is not considered permanent income.

30. The LeRoy's believe, and therefore allege, that the first, correctly filled-out loan application resulted in a debt-to-income ratio which was too high to pass muster under EquiFirst's subprime mortgage loan underwriting guidelines.

31. On information and belief, based upon correspondence from an executive officer of AMB addressed to the New York State Banking Department, EquiFirst, despite having actual knowledge that their application did not qualify for a loan, instructed AMB to resubmit the LeRoy's loan application on a 'stated income' basis, i.e., without the proof of income, debts and assets that resulted in the rejection of their initial, correctly itemized loan application.

32. In response to EquiFirst's instructions, AMB then prepared a second, and then a third loan application on the LeRoy's behalf, each on a stated-income basis.

33. The income figures on each of these two (2) stated income mortgage loan applications differed from those on the initial September 29, 2006 loan application.

34. The income figures on each of these two (2) stated income mortgage loan applications also differed from each other.

35.   Both the second and the third 'stated income' loan applications falsely stated the LeRoy's income in a manner intended to pass EquiFirst's stated income subprime mortgage loan underwriting guidelines.

36.   The income figures on these later loan applications were inflated by AMB, at the instruction, suggestion and encouragement of EquiFirst, in order to make the loan qualify for approval.

37.   EquiFirst sent pre-closing disclosures required by the Truth in Lending Act, or TILA, to the LeRoy's, which disclosures are dated October 10, 2006.

38.   EquiFirst's pre-closing disclosures included materials relevant to adjustable rate mortgages, as well as to fixed rate mortgages.

39.   The disclosures were accompanied by a transmittal letter which stated in part as follows: "We have also provided information concerning Adjustable Rate Mortgages. This information is only applicable to customers who have chosen an Adjustable Rate Mortgage."

40.   The LeRoy's had not chosen an Adjustable Rate Mortgage.

41.   A closing date for the EquiFirst refinance was scheduled, for October 20, 2006.

42.   On or about the night before the closing, Owen Quinn telephoned the LeRoy's and spoke with Mrs. LeRoy.

43.   Mr. Quinn informed Mrs. LeRoy at that time that the loan that they would be presented with the following day was not a fixed-rate mortgage with annual interest in the seven percent (7%) range, but an adjustable rate mortgage with annual interest in the nine percent (9%) range.

44.   When Mrs. LeRoy protested and stated that she could not afford such a loan, Mr. Quinn advised her not to worry, because he and his company would refinance the LeRoy's into a lower, fixed-rate mortgage within a few months.

45.    On or about the following day, October 20, 2006, a settlement agent employed by Angel Aguayo, d/b/a Liberty Title Agency of New York, having been selected by AMB and directly or indirectly approved by EquiFirst, arrived at the LeRoy residence to do the loan closing.

46.    The settlement agent informed the LeRoy's that, as she had another closing to attend shortly after theirs, they would need to move the closing along quickly in order for the settlement agent to attend that other closing.

47.    The settlement agent then presented the LeRoy's with the closing documents in quick succession (including the third, falsified loan application) for signature, without substantial explanation or a meaningful opportunity to read and understand them.

48.    The closing was completed in approximately one-half of an hour. The LeRoy's were not represented by an attorney either before or at the closing.

49.    A few months after the closing, Mrs. LeRoy went online to lendingtree.com, seeking to refinance out of the EquiFirst adjustable rate mortgage.

50.    Mrs. LeRoy engaged with a representative of Fidelity Mortgage, who expressed interest in working with her on a refinance.

51.    The Fidelity Mortgage loan representative wanted to have an appraisal done on the LeRoy's home in connection with this possible refinance.

52.    Mrs. Leroy advised that she had a recent appraisal, done a few months earlier.

53.    The Fidelity Mortgage representative asked whether Mrs. LeRoy had a copy of the appraisal, and as she did not, suggested that she request a copy from AMB.

54.    Mrs. LeRoy accordingly requested and received a copy of the appraisal from AMB.

55.    Mrs. LeRoy forwarded a copy of the appraisal to Fidelity Mortgage.

56.    Fidelity Mortgage had the Valerio appraisal reviewed.

This appraisal review revealed serious discrepancies between the data reported in the appraisal and the data reflected in public records sources.

57.    One of the three (3) allegedly comparable sales set forth in the appraisal is fictional, i.e., it does not exist in the location where it is said to exist, and does not have the characteristics, e.g., area in square feet, lot size, improvements, etc., which it is claimed to have.

58.    The second of the three (3) allegedly comparable sales in the appraisal has been substantially misrepresented by using a photograph of yet another property.

59.    The errors and misstatements in the appraisal make the LeRoy's home appear to be substantially more valuable than it really was at the time of the appraisal.

60.    A reasonable review of the appraisal would, and in the case of Fidelity Mortgage did, result in the rejection of the appraisal and its conclusion of value.

61.    As a result of the misrepresentations in the sales, marketing and processing of this loan, the misrepresentations in the appraisal of the LeRoy home, the negligent, knowingly wrongful and/or reckless underwriting of this subprime adjustable rate mortgage loan, and the deceptive manner in which the loan was closed, the LeRoy's stand to lose their home.

62.    The payments required under the adjustable rate subprime mortgage loan that EquiFirst made to the LeRoy's were unaffordable, even before any adjustment in the interest rate.

63.    The EquiFirst loan to the LeRoy's would not have been approved if reasonable underwriting guidelines had been used to evaluate the loan application materials.

64.    The LeRoy's now are at risk of losing what should have been their biggest, most important and most stable financial asset.

65.     Due to the falsely inflated value in the EquiFirst appraisal, the amount owed on the EquiFirst mortgage exceeds the value of the LeRoy's home, making it impossible for them to refinance or sell in order to avoid foreclosure.

## AS AND FOR A FIRST DEFENSE

66.     Defendants incorporate the allegations in the foregoing paragraphs with the same force and effect as if herein set forth.

67.     Admit the allegations of Paragraphs Second (as to the Defendants), Third, Fourth, Fifth, Seventh, Tenth, Twelfth, and Fourteenth of the complaint.

68.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraphs First, Sixth, Eleventh, and Thirteenth of the complaint.

69.     Deny the allegations of Paragraphs Eighth, Ninth and Fifteenth of the complaint.

70.     Paragraph Sixteenth of the complaint does not allege facts as between the Plaintiff and the Defendants, and accordingly Defendants neither admit nor deny the same.

## AS AND FOR A SECOND DEFENSE

71.     Defendants incorporate the allegations in the foregoing paragraphs with the same force and effect as if herein set forth.

72.     As set forth in the Defendants' First Counterclaim, *infra*, Defendants have rescinded the consumer credit transaction made the basis of Plaintiff's foreclosure, resulting in the cancellation of Plaintiff's mortgage lien.

73.     As Plaintiff does not have a lien against Defendants' property, this foreclosure action must be dismissed.

## AS AND FOR A THIRD DEFENSE

74.     Defendants incorporate the allegations in the foregoing paragraphs with the same force and effect as if herein set forth.

75.     AMB, upon the instruction and/or suggestion of an employee, agent or representative of EquiFirst, resubmitted this proposed loan using falsified income figures, in order to make the loan qualify for mortgage loan underwriting.

76.     EquiFirst, by operation of *respondeat superior*, knowingly directed and participated in AMB's false representations and fraud.

77.     AMB and, both directly and by aiding and abetting AMB, EquiFirst, intended that the Defendants rely on such knowingly false representations.

78.     Defendants did rely on such knowingly and intentionally false representations, by proceeding to close the EquiFirst loan.

79.     Defendants have suffered damages as the direct and proximate result of those knowingly and intentionally false representations, in an amount to be determined at trial.

80.     Defendants are entitled to set off all such damages incurred as a result of this fraud, by recoupment.

## AS AND FOR A FOURTH DEFENSE

81.     Defendants incorporate the allegations in the foregoing paragraphs with the same force and effect as if herein set forth.

82.     EquiFirst made a business decision to outsource the processing of its mortgage loans to third parties, mortgage brokers such as AMB.

83.     EquiFirst owed Defendants a duty of reasonable care in supervising AMB.

84.     EquiFirst breached that duty, as follows.

EquiFirst either failed to review the false appraisal report prepared in support of this loan, or failed to use reasonable care in any such review.

85.     In violation of its own underwriting guidelines and general underwriting guidelines for subprime mortgage loan originations, EquiFirst negligently allowed the submission of the proposed loan on a stated income basis after declining to entertain it on a full-documentation basis, or after entertaining it and rejecting it on such basis.

86.     EquiFirst failed to us reasonable care in examining into the differences between the three (3) loan applications presented in connection with this loan.

87.     EquiFirst negligently failed in this case to follow its own underwriting guidelines for assessing the applicable debt-to-income ratio for this loan.

88.     Defendants have been damaged by EquiFirst's negligent supervision of mortgage broker AMB.

89.     EquiFirst's negligence in supervising AMB has proximately caused Defendants' damages, in an amount to be determined at trial.

90.     Defendants are entitled to set off all such damages against EquiFirst's claims herein, by recoupment.

## AS AND FOR A FIFTH DEFENSE

91.     Defendants incorporate the allegations in the foregoing paragraphs with the same force and effect as if herein set forth.

92.     EquiFirst owed Defendants a duty of reasonable care in underwriting their mortgage loan.

93.     EquiFirst breached that duty, by, *inter alia*, failing to reasonably review the false appraisal submitted in support of this loan application, by allowing the submission of the proposed loan on a stated income basis after declining to approve it on a full-documentation

basis, and by failing to examine into the differences in the three (3) loan applications prepared by AMB in connection with this loan in one form or another.

94.    Defendants have been damaged by EquiFirst's negligence in underwriting this mortgage loan.

95.    EquiFirst's negligence in improvidently making this subprime mortgage loan is the proximate cause of Defendants' damages, in an amount to be determined at trial.

96.    Defendants are entitled to set off all such damages against EquiFirst's claims herein, by recoupment.

## AS AND FOR A SIXTH DEFENSE

97.    Defendants incorporate the allegations in the foregoing paragraphs with the same force and effect as if herein set forth.

98.    EquiFirst's actions and omissions in making this subprime mortgage loan to Defendants are unconscionable.

99.    EquiFirst's unconscionable conduct is the proximate cause of Defendants' damages herein, in an amount to be determined at trial.

100.    Defendants are entitled to set off all such damages against EquiFirst's claims herein, by recoupment.

## AS AND FOR A SEVENTH DEFENSE

101.    Defendants incorporate the allegations in the foregoing paragraphs with the same force and effect as if herein set forth.

102.    EquiFirst has been unjustly enriched by its inequitable conduct herein, in the amount of all amounts it has received from or on the account of the Defendants, plus the equity

in Defendants' home which they have lost as the result of the above-complained-of wrongful actions and omissions.

103.    EquiFirst should be required to make full restitution to Defendants of all such amounts.

104.    Defendants are entitled to set off all those amounts by which EquiFirst has been unjustly enriched, against any and all of EquiFirst's claims herein, by recoupment.

## AS AND FOR A EIGHTH DEFENSE

105.    Defendants incorporate the allegations in the foregoing paragraphs with the same force and effect as if herein set forth.

106.    EquiFirst's actions and omissions in connection with the sales and marketing, loan processing, loan underwriting and loan closing constitute a breach of the covenant of good faith and fair dealing implied by law in all contracts within this state.

107.    EquiFirst's breach of the implied covenant of good faith and fair dealing are the proximate cause of Defendants' damages herein, in an amount to be determined at trial.

108.    Defendants are entitled to set off all such damages against EquiFirst's claims herein, by recoupment.

## AS AND FOR A NINTH DEFENSE

109.    Defendants incorporate the allegations in the foregoing paragraphs with the same force and effect as if herein set forth.

110.    EquiFirst is equitably estopped from continuing with the foreclosure of its wrongfully-obtained mortgage lien

## AS AND FOR A TENTH DEFENSE

111.    Defendants incorporate the allegations in the foregoing paragraphs with the same force and effect as if herein set forth.

112.    Foreclosure is an equitable remedy, and EquiFirst comes before this Court with unclean hands.

113.    Having failed to do equity, EquiFirst may not now demand equity in the form of the foreclosure of its unlawfully-obtained mortgage lien.

## AS AND FOR A FIRST COUNTERCLAIM

114.    Defendants incorporate the allegations in the foregoing paragraphs with the same force and effect as if herein set forth.

115.    This Counterclaim is filed under, *inter alia,* the Truth in Lending Act, 15 U.S.C. § 1601 (hereinafter called "TILA") to enforce the defendants' right to rescind a consumer credit transaction, to void the plaintiff's security interest in the defendants' home, and to recover statutory damages, reasonable attorney's fees and costs by reason of the plaintiff's violations of TILA and Regulation Z, 12 C.F.R. § 226 (hereinafter called "Reg. Z").

116.    At all times relevant hereto, plaintiff EquiFirst Corporation ("EquiFirst"), in the ordinary course of its business, regularly extended or offered to extend consumer credit for which a finance charge is or may be imposed or which, by written agreement, is payable in more than four installments.

117.    The consumer credit transaction (sometimes hereinafter "the transaction") with plaintiff, in which the plaintiff extended consumer credit to the defendants, was subject to a finance charge payable to plaintiff.

118.    As part of this consumer credit transaction, the plaintiff retained a security interest in 43 Aldow Street, Wurtsboro, New York, the Defendants' home.

119.    The security interest was not created to finance the acquisition or initial construction of Plaintiff's dwelling.

120.    This consumer credit transaction was subject to the Plaintiff's right of rescission as described by 15 U.S.C. § 1635 and Reg. Z § 226.23 (12 C.F.R. § 226.23).

121.    In the course of this consumer credit transaction, EquiFirst violated 15 U.S.C. § 1635(a) and Reg. Z § 226.23(b) by failing to provide the Defendants with two copies of a notice of the right to rescind which they could keep and which:

    a.    Identified the transaction;

    b.    Clearly and conspicuously disclosed the security interest in the Defendants' principal dwelling;

    c.    Clearly and conspicuously disclosed the Defendants' right to rescind the transaction;

    d.    Clearly and conspicuously disclosed how to exercise the right to rescind the transaction, with a form for that purpose, designating the address of EquiFirst's place of business;

    e.    Clearly and conspicuously disclosed the effects of rescission; and

    f.    Clearly and conspicuously disclosed the date the rescission period expired.

    .    In the course of this consumer credit transaction, EquiFirst failed to deliver all "material" disclosures required by the TILA and Reg. Z, including the following:

    a.    By failing to properly and accurately disclose the "amount financed," using that term in violation of Regulation Z § 226.18(b) and 15 U.S.C. § 1638(a)(2)(A).

      b.       By failing to clearly and accurately disclose the "finance charge," using that term, in violation of Regulation Z §§ 226.4 and 226.18(d) and 15 U.S.C. § 1638(a)(3).

      c.       By failing to clearly and accurately disclose the "annual percentage rate," using that term, in violation of Regulation Z § 226.18(e) and 15 U.S.C. § 1638(a)(4).

122.    The Defendants have a continuing right to rescind the transaction until the third business day after receiving both the notice described in paragraph __ and all "material" disclosures described in paragraph 12, pursuant to 15 U.S.C. § 1635(a) and Regulation Z § 226.23(a)(3), up to three years after consummation of the transaction.

123.    On February 29, 2008, the Defendants rescinded the transaction by sending to EquiFirst Corporation at (i) Special Assets-NC 4742, 701 Corporate Center Drive, Raleigh, North Carolina 27607, and (ii) EquiFirst Corporation, 500 Forest Point Circle, Charlotte, NC 28273; to EquiFirst's foreclosure attorneys at Shapiro & DiCaro, LLP, 250 Mile Crossing Boulevard, Suite One, Rochester, NY 14624, Attn: Frank M. Cassara, Esq.; and to EquiFirst's servicing agent HomEq Servicing at HomEq Servicing, as servicing agent, 4837 Watt Avenue, North Highlands, CA 95660, by U.S. Mail, postage prepaid, certified mail, return receipt requested, and also by first class mail, a notice of rescission.

124.    A true and accurate copy of that notice of rescission is annexed hereto as Exhibit "A", and is incorporated herein by this reference.

125.    As a result of the aforesaid violations of TILA and Reg. Z, pursuant to 15 U.S.C. §§ 1635(a), 1640(a), and 1641(c), Plaintiff is liable to Defendants for:

      a.       Rescission of this transaction.

b.      Termination of any security interest in Defendants' property created under the
transaction.

c.      Return of any money or property given by the Defendants to anyone, including
the Plaintiff, in connection with this transaction.

d.      Statutory damages of $2000 for the disclosure violations.

e.      Actual damages in an amount to be determined at trial.

f.      A reasonable attorney fee, plus costs of this action.

## AS AND FOR A SECOND COUNTERLCLAIM

126.    Defendants incorporate the allegations in the foregoing paragraphs with the same
force and effect as if herein set forth.

127.    EquiFirst has violated the provisions of Section 349 of the New York General
Business Law ("NY GBL"), in that EquiFirst's actions and omissions in processing, underwriting
and closing the LeRoy's mortgage loan were deceptive.

128.    The LeRoy's were damaged as a result of EquiFirst deceptive actions and
omissions.

129.    As a result of the aforesaid violations of NY GBL § 349, EquiFirst is liable to the
LeRoy's for their statutory damages up to $1,000.00, actual damages in an amount to be proven
at trial, the costs of this action, and a reasonable attorney fee.

WHEREFORE, it is respectfully prayed that this Court:

1.      Declare the security interest in Defendants' home void;

2.      Rescind the transaction of October 20, 2006;

3.      Order Plaintiff to take all action necessary to terminate any security interest in
Defendants' property created under the transaction and that the Court
declare all such security interests void, including but not limited to the
mortgage related to the transaction of October 20, 2006;

4.    Order the return to the Defendants of any money or property given by the
      Defendants to anyone, including the Plaintiff, in connection with the
      transaction;

5.    Enjoin Plaintiff during the pendency of this action, and permanently thereafter,
      from instituting, prosecuting, or maintaining foreclosure proceedings on
      the Defendants' property, from recording any deeds or mortgages
      regarding the property or from otherwise taking any steps to deprive
      Defendants of ownership of that property;

6.    Award the Defendants statutory damages for the disclosure violations, in the
      amount of twice the finance charge in connection with this transaction, but
      not less than $200 or more than $2000 as provided under 15 U.S.C. §
      1640(a);

7.    Award the Defendants statutory damages for Plaintiff's failure to respond
      properly to the Defendants' rescission notice, in the amount of twice the
      finance charge in connection with this transaction, but not less than $200
      or more than $2000 as provided under 15 U.S.C. § 1640(a);

8     Order that, because the Defendants failed to respond to the Plaintiff's
      notice of rescission, the Plaintiff has no duty to tender, but in the
      alternative, if tender is required, determine the amount of the tender
      obligation in light of all of the Plaintiff's defenses and claims, and order
      the Plaintiff to accept tender on reasonable terms and over a reasonable
      period of time;

9.    Award statutory attorney's fees up to $1,000 under New York GBL § 349;

10.   Award actual damages in an amount to be established at trial;

11.   Award the Defendants costs and a reasonable attorney fee as provided under 15
      U.S.C. § 1640(a);

12.   Award such other and further relief as the Court deems just and proper.

Dated: Goshen, New York
       March 10, 2008

                                    Yours, etc.

                          By:    _____
                                 Mike Pinsky, Esq.
                                 Michael D. Pinsky, P.C.
                                 Attorney for Defendants William J. LeRoy
                                 And Charlene LeRoy
                                 PO Box 148
                                 Goshen, New York 10924
                                 Tel: (845) 294-5123

February 29, 2008

*By CM/RRR and by first class mail to:*
EquiFirst Corporation
500 Forest Point Circle
Charlotte, NC 28273

*By CM/RRR and by first class mail to:*
Shapiro & DiCaro, LLP
250 Mile Crossing Boulevard
Suite One
Rochester, NY 14624
Attn: Frank M. Cassara, Esq.
Foreclosure attorneys for
EquiFirst Corporation

*By CM/RRR and by first class mail to:*
HomEq Servicing, as
servicing agent
4837 Watt Avenue
North Highlands, CA 95660
*(For forwarding to owner and holder of note and mortgage)*

*By CM/RRR and by by first class mail to:*
Equifirst Corporation
Special Assets – NC 4742
701 Corporate Center Drive
Raleigh, North Carolina 27607

Re:    Charlene LeRoy and William J. LeRoy
       43 Aldow Street
       Wurtsboro, NY 12790

       Mortgage from William J. LeRoy and Charlene LeRoy to EquiFirst Corporation, dated
       October 20, 2006

Dear Sirs:

We wish to cancel the above-referenced mortgage.

*(signature)*
William J. LeRoy

*(signature)*
Charlene LeRoy

EXHIBIT "A"

U.S. PO    SERVICE    **CERTIFICATE OF MAILING**

MAY BE USED FOR DOMESTIC AND INTERNATIONAL MAIL, DOES NOT
PROVIDE FOR INSURANCE-POSTMASTER

Received From:

Michael D. Pinsky P.C.
211 Main Street Box 148
Goshen NY 10924

One piece of ordinary mail addressed to:

Equifirst Corporation
500 Forest Point Circle
Charlotte, NC 28273

$1.05

PS Form **3817**, January 2001

---

**U.S. Postal Service™**
**CERTIFIED MAIL™ RECEIPT**
(Domestic Mail Only; No Insurance Coverage Provided)

For delivery information visit our website at www.usps.com.

OFFICIAL USE

| | | |
|---|---|---|
| Postage | $ $0.41 | 0037 |
| Certified Fee | $2.65 | 04 |
| Return Receipt Fee (Endorsement Required) | $2.15 | Postmark Here |
| Restricted Delivery Fee (Endorsement Required) | $0.00 | |
| Total Postage & Fees | $ $5.21 | 02/29/2008 |

Sent To
EquiFirst Corporation
Street, Apt. No.; or PO Box No.
500 Forest Point Circle
City, State, ZIP+4
Charlotte, NC 28273

7005 1160 0005 4723 5257

PS Form 3800, June 2002     See Reverse for Instructions

---

**SENDER:** *COMPLETE THIS SECTION*

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

EquiFirst Corporation
500 Forest Point Circle
Charlotte, NC 28273

*COMPLETE THIS SECTION ON DELIVERY*

A. Signature
☐ Agent
☐ Addressee

B. Received by
HomEq-Raleigh Mail Room
C. Date of Delivery

D. Is delivery address different from item 1? ☐ Yes
If YES, enter delivery address below: ☐ No

3. Service Type
☒ Certified Mail    ☐ Express Mail
☐ Registered    ☐ Return Receipt for Merchandise
☐ Insured Mail    ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)    ☐ Yes

2. Article Number
(Transfer from service label)     7005 1160 0005 4723 5257

PS Form 3811, August 2001     Domestic Return Receipt     2ACPRI-03-P-4081

**U.S. POSTAL SERVICE**     **CERTIFICATE OF MAILING**

MAY BE USED FOR DOMESTIC AND INTERNATIONAL MAIL, DOES NOT
PROVIDE FOR INSURANCE-POSTMASTER

Received From:

Michael D Pinsky P.C.
211 Main St.   Box 148
Goshen NY  10924

One piece of ordinary mail addressed to:

Equifirst Corporation
Special Assets – NC 4742
701 Corporate Center Drive
Raleigh, North Carolina 27607

PS Form 3817, January 2001

U.S. POSTAGE
GOSHEN, NY
10924
FEB 29 '08
AMOUNT
$1.05
00032-445-04

---

**U.S. Postal Service™**
**CERTIFIED MAIL™ RECEIPT**
(Domestic Mail Only; No Insurance Coverage Provided)

For delivery information visit our website at www.usps.com

OFFICIAL USE

| | | |
|---|---|---|
| Postage | $ | $0.41 | 0037 |
| Certified Fee | | $2.65 | 04 |
| Return Reciept Fee (Endorsement Required) | | $2.15 | Postmark Here |
| Restricted Delivery Fee (Endorsement Required) | | $0.00 | |
| Total Postage & Fees | $ | $5.21 | 02/29/2008 |

Sent To
Equifirst Corporation
Street, Apt. No.; or PO Box No.  Special Assets – NC 4742
City, State, ZIP+4  701 Corporate Center Drive
Raleigh, North Carolina 27607

PS Form 3800, June 2002

7003 1680 0006 8814 5478

---

**SENDER: COMPLETE THIS SECTION**

■ Complete items 1, 2, and 3. Also complete
   item 4 if Restricted Delivery is desired.
■ Print your name and address on the reverse
   so that we can return the card to you.
■ Attach this card to the back of the mailpiece,
   or on the front if space permits.

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X                                    ☐ Agent
                                     ☐ Addressee
B. Received by (Printed Name)     C. Date of Delivery

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:       ☐ No

1. Article Addressed to:

Equifirst Corporation
Special Assets – NC 4742
701 Corporate Center Drive
Raleigh, North Carolina 27607

3. Service Type
☐ Certified Mail    ☐ Express Mail
☐ Registered        ☐ Return Receipt for Merchandise
☐ Insured Mail      ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)    ☐ Yes

2. Article Number
(Transfer from service label)     7003 1680 0006 8814 5478

PS Form 3811, August 2001     Domestic Return Receipt     2ACPRI-03-P-4081



U.S. POSTAL SERVICE     **CERTIFICATE OF MAILING**

MAY BE USED FOR DOMESTIC AND INTERNATIONAL MAIL, DOES NOT
PROVIDE FOR INSURANCE--POSTMASTER

Received From:

Michael D. Pinsky PC.
211 Main Street Box 14E
Goshen, NY 10924

One piece of ordinary mail addressed to:

Shapiro & DiCaro LLP
250 Mile Crossing Boulevard
Suite One       NY 14624
Attn: Frank M Cassara, Esq.

PS Form **3817**, January 2001

U.S. POSTAGE
PAID
GOSHEN, NY
FEB 29 '08
AMOUNT
$1.05
00324455-04

---

**U.S. Postal Service**™
**CERTIFIED MAIL**™ **RECEIPT**
*(Domestic Mail Only; No Insurance Coverage Provided)*

For delivery information visit our website at www.usps.com®

OFFICIAL USE

| | | |
|---|---|---|
| Postage | $ $0.41 | 0037 |
| Certified Fee | $2.65 | 04 |
| Return Receipt Fee (Endorsement Required) | $2.15 | Postmark Here |
| Restricted Delivery Fee (Endorsement Required) | $0.00 | |
| Total Postage & Fees | $ $5.21 | 02/29/2008 |

Sent To
Shapiro & DiCaro, LLP
Street, Apt. No.; or PO Box No.
250 Mile Crossing Boulevard
City, State, ZIP+4
Suite One
Rochester, NY 14624
Attn: Frank M. Cassara, Esq.

PS Form 3800, June    Instructions

7003 1680 0006 8814 5454

---

**SENDER:** *COMPLETE THIS SECTION*

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Shapiro & DiCaro, LLP
250 Mile Crossing Boulevard
Suite One
Rochester, NY 14624
Attn: Frank M. Cassara, Esq.

*COMPLETE THIS SECTION ON DELIVERY*

A. Signature
X                                    ☐ Agent
                                     ☐ Addressee
B. Received by ( Printed Name )    C. Date of Delivery
                                     3-3
D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:        ☐ No

3. Service Type
   ☑ Certified Mail    ☐ Express Mail
   ☐ Registered        ☐ Return Receipt for Merchandise
   ☐ Insured Mail      ☐ C.O.D.

4. Restricted Delivery? *(Extra Fee)*    ☐ Yes

2. Article Number
   *(Transfer from service label)*    7003 1680 0006 8814 5454

PS Form 3811, August 2001    Domestic Return Receipt    2ACPRI-03-P-4081

PLACE STICKER AT TOP OF ENVELOPE TO THE RIGHT
OF THE RETURN ADDRESS, FOLD AT DOTTED LINE

U.S. POSTAL SERVICE          CERTIFICATE OF MAILING

MAY BE USED FOR DOMESTIC AND INTERNATIONAL MAIL, DOES NOT
PROVIDE FOR INSURANCE—POSTMASTER

Received From:

*Michee W Presley PC*
*211 MAIN ST. BOX 148*
*GOSHEN NY 10924*

One piece of ordinary mail addressed to:

*HomEq Servicing as servicing agent*
*4837 W 2H O Avenue*
*North Highlands CA 95660*

PS Form 3817, January 2001

---

U.S. Postal Service
CERTIFIED MAIL RECEIPT
(Domestic Mail Only; No Insurance Coverage Provided)

For delivery information visit our website at www.usps.com

OFFICIAL USE

| | | |
|---|---|---|
| Postage | $0.41 | 0037 |
| Certified Fee | $2.65 | 04 |
| Return Receipt Fee (Endorsement Required) | $2.15 | Postmark Here |
| Restricted Delivery Fee (Endorsement Required) | $0.00 | |
| Total Postage & Fees | $5.21 | 02/29/2008 |

Sent To
HomEq Servicing, as servicing agent
Street, Apt. No.; or PO Box No.
4837 Watt Avenue
City, State, ZIP+4
North Highlands, CA 95660

PS Form 3800, June 2002          See Reverse for Instructions

7003 1680 0006 8814 5485

---

SENDER: COMPLETE THIS SECTION

■ Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
■ Print your name and address on the reverse so that we can return the card to you.
■ Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

HomEq Servicing, as servicing agent
4837 Watt Avenue
North Highlands, CA 95660

COMPLETE THIS SECTION ON DELIVERY

A. Signature
X                                    ☐ Agent
                                     ☐ Addressee
B. Received by ( Printed Name )   C. Date of Delivery

D. Is delivery address different from item 1?   ☐ Yes
   If YES, enter delivery address below:          ☐ No

3. Service Type
☒ Certified Mail     ☐ Express Mail
☐ Registered         ☐ Return Receipt for Merchandise
☐ Insured Mail       ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)          ☐ Yes

2. Article Number
(Transfer from service label)     7003 1680 0006 8814 5485

PS Form 3811, August 2001          Domestic Return Receipt          2ACPRI-03-P-4081

## VERIFICATION

STATE OF NEW YORK        }
                         } ss.
COUNTY OF ORANGE         }

    The undersigned, being duly sworn, deposes and says: he is the attorney for Defendants William J. LeRoy and Charlene LeRoy in this action and that the foregoing answer is true to my own knowledge except as to matters therein stated upon information and belief, and as to those matters, I belie

Defendants is t

STATE OF NEW YORK        } ss.:
Sullivan County Clerk's Office }

I, Daniel L. Briggs, County Clerk in and for said County, do hereby certify that I have compared the foregoing copy of a<u>n Answer to</u> <u>mortgage complaint for Index # 492-08</u> with the original now remaining on <u>File</u> in this office and that the same is a correct transcript therefrom and of the whole of said original.

Sworn to befor
10th day of Ma

ENDORSED, FILED.

March 10th, 2008

Daniel L. Briggs
        Clerk

    In testimony whereof, I have hereunto set my hand and affixed the seal of said County this <u>16th</u> day of <u>April</u> A.D., <u>2008</u>.

Daniel L. Briggs
        , Clerk

NOTARY PUI

PETER WILLIAM GREEN
NOTARY PUBLIC, STATE OF NEW YORK
NO. 02GR6176442
QUALIFIED IN ORANGE COUNTY
COMMISSION EXPIRES OCTOBER 29, 2011

## CERTIFICATION BY ATTORNEY

I, Mike Pinsky, am an attorney duly admitted to practice law in New York. I certify

pursuant to Section 130-1.1-a of the Rules of the Chief Administrator that, to the best of my

knowledge, information and belief, formed after reasonable inquiry, that the presentation of the

Answer to Mortgage Foreclosure Complaint in this action, and the contentions therein, are not

frivolous as defined in subsection (c) of Section 130-1.1 of the Rules of the Chief Administrator

(22 NYCRR).

Dated: Goshen, NY
      March 10, 2008

Mike Pinsky, Esq.
Michael D. Pinsky, P.C.
Attorney for Defendants
William J. LeRoy and Charlene LeRoy
211 Main Street, Box 148
Goshen, New York 10924
(845) 294-5123

SUPREME COURT STATE OF NEW YORK
COUNTY OF SULLIVAN

| | |
|---|---|
| Equifirst Corporation, | ) |
| Plaintiff, | ) |
| -against- | ) Index No. 08-492 |
| | ) |
| William J. LeRoy a/k/a William Leroy, | ) |
| Charlene LeRoy a/k/a Charlene Leroy, | ) |
| and "JOHN DOE #1" through "JOHN | ) |
| DOE #10", the last ten names being | ) **AFFIRMATION OF SERVICE** |
| fictitious and unknown to the Plaintiff, the | ) |
| person or parties intended being the | ) |
| person or parties, if any, having or | ) |
| claiming an interest in or lien upon the | ) |
| mortgaged premises described in the | ) |
| complaint, | ) |
| Defendants. | ) |

The undersigned is an attorney duly licensed to practice law in the State of New York, and under the penalties of perjury, affirms the following:

I am the attorney of record for Defendants William J. LeRoy and Charlene LeRoy in the above-captioned action. My business address is 211 Main Street, Box 148, Goshen, New York 10924. On March 10, 2008, I served the annexed Answer to Mortgage Foreclosure Complaint by mailing a true copy thereof in a post office or official depository of the United States Postal Service within
addressed to th

Frank N
Shapiro
250 Mil
Suite Or
Rochest

**STATE OF NEW YORK**     } ss.:
**Sullivan County Clerk's Office**

I, Daniel L. Briggs, County Clerk in and for said County, do hereby certify that I have compared the foregoing copy of an *Affirmation of Service for Index # 492-08* with the original now remaining on *File* in this office and that the same is a correct transcript therefrom and of the whole of said original.

**ENDORSED, FILED.**

march 10th 2008
Daniel L. Briggs
Clerk

In testimony whereof, I have hereunto set my hand and affixed the seal of said County this *16th* day of *April* A.D. *2008*.

Daniel L. Briggs
, Clerk

Dated: Goshen,
March 1

William J. LeRoy and Charlene LeRoy
211 Main Street, Box 148
Goshen, New York 10924
(845) 294-5123